In re SOUTH AFRICAN APARTHEID LITIGATION.

This Document Relates to:

Lungisile Ntsebeza, et al., Plaintiffs,

v.

Daimler AG, et al., Defendants.

Khulumani, et al., Plaintiffs,

v.

Barclays National Bank Ltd., et al., Defendants.

Nos. 02 MDL 1499(SAS), 02 Civ. 4712(SAS), 02 Civ. 6218(SAS), 03 Civ. 1024(SAS), 03 Civ. 4524(SAS).

United States District Court, S.D. New York.

April 8, 2009.

Opinion Denying Reconsideration May 27, 2009.

234

238

Jay J. Rice, Esq., Diane E. Sammons, Esq., Nagel Rice LLP, Roseland, NJ, Tyler R. Giannini, Esq., International Human Rights Clinic, Harvard Law School, Cambridge, MA, Helen I. Zeldes, Esq., Zeldes & Haeggquist, LLP, San Diego, CA, Medi Mokuena, Esq., Mokuena Attorneys, Republic of South Africa, John Sindiso Ngcebetsha, Esq., Gugulethu Oscar Madlanga, Esq., Ngcebetsha Madlanga Attorneys, Republic of South Africa, Paul L. Hoffman, Esq., Schonbrun DeSimone Seplow Harris & Hoffman, Venice, CA, Judith Brown Chomsky, Esq., Law Offices of Judith Brown Chomsky, Elkins Park, PA, Michael Francis Osborne, Esq., Republic of South Africa, Dumisa Buhle Ntsebeza, Esq., Duma Nokwe Group of Advocates, Fountain Chambers, Republic of South Africa, for Plaintiffs Ntsebeza et al.

Michael D. Hausfeld, Esq., Hausfeld LLP, Washington, DC, Charles Peter Abrahams, Esq., Abrahams Kiewitz, Republic of South Africa, Matt Schultz, Esq., Levin Papantonio Thomas Mitchell Echsner & Proctor, P.A., Pensacola, FL, Steig D. Olson, Esq., Hausfeld LLP, New York, NY, Robert G. Kerrigan, Esq., Kerrigan, Estess, Rankin & McLeod, LLP, Pensacola, FL, for Plaintiffs Khulumani et al.

Francis P. Barron, Esq., Ronald S. Rolfe, Esq., David Greenwald, Esq., Cravath, Swaine & Moore LLP, New York, NY, for Defendant UBS A.G.

Keith R. Hummel, Esq., Cravath, Swaine & Moore LLP, New York, NY, for

Defendant International Business Machines Corp.

Jayant W. Tambe, Esq., Robert S. Walker, Esq., Jones Day, New York, NY, for Defendant General Motors Corp.

Marc J. Gottridge, Esq., Lovells LLP, New York, NY, for Defendant Barclays Bank PLC.

Mark D. McPherson, Esq., Michael Gerard, Esq., Morrison & Foerster LLP, New York, NY, for Defendant Fujitsu Limited.

John H. Beisner, Esq., O'Melveny & Myers LLP, Washington, DC, for Defendant Ford Motor Company.

Jerome S. Hirsch, Esq., Susan L. Saltzstein, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY, for Defendant Daimler A.G.

*OPINION & ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .240

II. BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .241
 A. Core Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .241
 B. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .243

III. LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .245
 A. Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .245
 B. The Alien Tort Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .245

IV. EXTRATERRITORIALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .246

V. RECOGNIZED TORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .247
 A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .248
 1. Recognition of Torts Under the Law of Nations . . . . . . . . . . . . . . . . . .248
 2. Corporate Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .250
 B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .250
 1. Apartheid by a Non–State Actor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .250
 2. Arbitrary Denationalization by a State Actor. . . . . . . . . . . . . . . . . . . . .252
 3. Cruel, Inhuman, or Degrading Treatment . . . . . . . . . . . . . . . . . . . . . . .253
 4. Corporate Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .254

VI. SECONDARY LIABILITY STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .255
 A. Source of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .255
 B. Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .257
 1. Actus Reus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .257
 2. Mens Rea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .259
 C. Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .263

VII. SPECIFIC AIDING AND ABETTING CLAIMS. . . . . . . . . . . . . . . . . . . . . . . .263
 A. The Ntsebeza Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .263
 1. The Automotive Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .264
 2. International Business Machines Corporation . . . . . . . . . . . . . . . . . . . .265
 3. Barclays Bank PLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .266
 B. The Khulumani Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .266
 1. Automotive Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .266
 2. The Technology Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .268
 3. Banking Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .269
 4. Rheinmetall Group A.G.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .269

VIII. ALTER–EGO AND AGENCY ............................................ 270
 A. Applicable Law ...................................................... 270
 1. Piercing the Corporate Veil ....................................... 271
 2. Corporate Agency ................................................ 272
 B. Discussion .......................................................... 273
 1. Piercing the Corporate Veil ....................................... 274
 2. Corporate Agency ................................................ 274

IX. PRUDENTIAL DOCTRINES ........................................... 276
 A. Factual Background ................................................. 276
 1. United States Government Statements ............................. 276
 2. South African Government Statements ............................ 277
 3. Statements by TRC Commissioners ............................... 278
 B. Applicable Law ...................................................... 280
 1. Case–Specific Deference .......................................... 280
 2. Political Question Doctrine ....................................... 281
 3. International Comity .............................................. 282
 C. Discussion .......................................................... 283
 1. Political Question ................................................ 283
 2. Comity .......................................................... 285
 D. Re–Soliciting Governmental Views .................................. 286

X. STATUTE OF LIMITATIONS ......................................... 286
 A. Applicable Law ...................................................... 287
 1. Equitable Tolling ................................................ 287
 2. Relation Back ................................................... 289
 3. American Pipe Tolling ............................................ 290
 B. Discussion .......................................................... 291
 1. Equitable Tolling ................................................ 291
 2. Relation Back and American Pipe Tolling ......................... 291

XI. STANDING ......................................................... 293
 A. Applicable Law ...................................................... 293
 B. Discussion .......................................................... 295

XII. CONCLUSION ...................................................... 296

*The truth about apartheid—about its causes and effects ... about who was responsible for its maintenance—continue to emerge. This litigation is one element of that emergence.*

— Archbishop Desmond Tutu and Commissioners of the Truth and Reconciliation Commission of South Africa [1]

## I. INTRODUCTION

Two actions brought on behalf of massive classes of South Africans ("plaintiffs") assert that several multinational corporations ("defendants") aided and abetted torts in violation of customary international law. Plaintiffs claim jurisdiction in United States courts under the Alien Tort Claims Act ("ATCA").[2] These lawsuits address the obligations of corporations under the law of nations, the role of American

---

1. Brief of Amici Curiae Commissioners and Committee Members of South Africa's Truth and Reconciliation Commission in Support of Appellants in *Khulumani* ("TRC Br.") at 13–14, *reproduced at* Plaintiffs' Appendix ("Pl. App.") 235.

2. 28 U.S.C. § 1350. This provision is alternatively known as the Alien Tort Statute ("ATS").

courts in enforcing universal norms of international law, and the legacy of South African apartheid.

After more than six years of litigation, defendants have filed a second consolidated motion to dismiss these actions in their entirety. Plaintiffs have filed a motion to re-solicit the views of the Governments of the United States and South Africa concerning this litigation. For the reasons that follow, defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' motion to re-solicit the views of the governments is denied.

## II. BACKGROUND

### A. Core Allegations

The crimes of the apartheid regime that governed South Africa from 1948 to 1994 are well documented.[3] Beginning in the late 1940s, the South African Government instituted a separation of the races, starting with classification[4] and anti-miscegenation laws[5] and proceeding swiftly to geographic segregation.[6] In 1951, passage of the Bantu Authorities Act created

"homelands" that were eventually labeled distinct nations.[7] Black South Africans were forcibly removed to bantustans created by this Act then stripped of their South African citizenship.[8] Resistance to these policies led to violent state repression beginning with the Sharpesville Massacre of March 21, 1960, continuing through the Soweto Uprising of 1976 and conflicts between the apartheid government and resisters that stretched through the 1980s.[9] Moreover economic,[10] political,[11] and educational[12] aspects of apartheid led to the full-scale disenfranchisement and marginalization of the majority of the South African population. Plaintiffs allege that defendants—through both their direct practices and the provision of substantial assistance to the apartheid regime—bear some measure of responsibility for the crimes that pervaded that dark era in South African history.

Plaintiffs in the first action, *Ntsebeza v. Daimler A.G.* (*"Ntsebeza* plaintiffs"), allege that they suffered discriminatory employment practices, employment retaliation

---

**3.** *See, e.g.,* Comprehensive Anti–Apartheid Act, 22 U.S.C. § 5011, *repealed by* South African Democratic Transition Support Act of 1993, 22 U.S.C. § 5001 note (describing apartheid policies that the United States directly opposed). *See also* 22 U.S.C. § 5020(a)(1), *repealed by* 22 U.S.C. § 5001 note ("The Congress finds that the policy of apartheid is abhorrent and morally repugnant.").

**4.** *See* Population Registration Act 30 of 1950 (S. Afr.).

**5.** *See* Prohibition of Mixed Marriages Act 55 of 1949 (S. Afr.); Immorality Amendment Act 21 of 1950 (S. Afr.).

**6.** *See* Group Areas Act 41 of 1950 (S. Afr.). *See also* Reservation of Separate Amenities Act 49 of 1953 (S. Afr.).

**7.** *See* Bantu Authorities Act 68 of 1951 (S. Afr.).

**8.** *See* Bantu Homelands Citizenship Act 26 of 1970 (S. Afr.). The bantustans were majority-

black territories carved out of South Africa and declared independent countries. "No country, other than South Africa, recognized these territories as independent states." Complaint, *Ntsebeza v. Daimler A.G.* (*"Ntsebeza* Complaint") ¶ 47.

**9.** *See Ntsebeza* Complaint ¶¶ 42, 49–50.

**10.** *See, e.g.,* Bantu Building Workers Act 27 of 1951 (S. Afr.); Native Labour (Settlement of Disputes) Act 48 of 1953;

**11.** *See, e.g.,* Separate Representation of Voters Act 46 of 1951 (S. Afr.); South Africa Act Amendment Act 9 of 1956 (S. Afr.); Separate Representation of Voters Amendment Act 50 of 1968 (S. Afr.); Bantu Investment Corporation Act 34 of 1959 (S. Afr.).

**12.** *See, e.g.,* Extension of University Education Act 45 of 1959 (S. Afr.).

for political beliefs, geographic segregation, arbitrary arrest and detention, torture, forced exile, arbitrary denationalization, and the extrajudicial killing of family members.[13] The *Ntsebeza* plaintiffs bring a class action on behalf of "themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries" as a result of defendants' direct and secondary violations of the law of nations.[14]

Plaintiffs in the second action, *Khulumani v. Barclays National Bank Ltd.* ("*Khulumani* plaintiffs"), include both Khulumani—a South African organization that "works to assist victims of apartheid-era violence"—and individuals who suffered geographic segregation, arbitrary arrest and detention, rape, torture, and the extrajudicial killing of family members.[15] The *Khulumani* plaintiffs bring a class action on behalf of four distinct classes:

- An "extrajudicial killing class" of all surviving personal representatives of persons who were subject to extrajudicial killing by South African security forces between 1960 and 1994;

- A "torture class" of all persons who were subject to torture and rape by South African security forces between 1960 and 1994;

- A "detention class" of all persons who were subject to prolonged unlawful detention by South African security forces between 1960 and 1994; and

- A "cruel treatment class" consisting of all persons who were subject to cruel, inhuman, and degrading treatment by South African security forces between 1960 and 1994.[16]

Defendants Daimler A.G., Ford Motor Company, and General Motors Corporation ("GM") (collectively "the automotive defendants") are multinational automotive companies headquartered in Stuttgart, Germany; Dearborn, Michigan; and Detroit, Michigan respectively.[17] Defendants International Business Machines Corporation ("IBM") and Fujitsu Ltd. (collectively "the technology defendants") are multinational computer hardware and software corporations headquartered in Armonk, New York and Tokyo, Japan respectively.[18] Defendants Barclays Bank PLC/Barclays National Bank Ltd. ("Barclays") and Union Bank of Switzerland A.G. ("UBS") (collectively "the banking defendants") are multinational banks headquartered in London, England and both Zurich and Basel, Switzerland respectively.[19] Finally, defendant Rheinmetall Group A.G. is a holding company headquartered in Düsseldorf, Germany and is the parent company of Oerlikon Contraves A.G., an armaments manufacturer headquartered in Zurich, Switzerland.[20]

The *Ntsebeza* plaintiffs allege that the automotive defendants—or their agents or alter egos—committed both direct and

---

13. *See Ntsebeza* Complaint ¶¶ 16–28.

14. *Id.* ¶ 149.

15. *See* Complaint, *Khulumani v. Barclays Nat'l Bank Ltd.* ("*Khulumani* Complaint") ¶¶ 18–31.

16. *Id.* ¶ 40.

17. *See Ntsebeza* Complaint ¶¶ 30–32; *Khulumani* Complaint ¶¶ 33–34, 36.

18. *See Ntsebeza* Complaint ¶ 33; *Khulumani* Complaint ¶¶ 35, 37.

19. *See Ntsebeza* Complaint ¶ 29; *Khulumani* Complaint ¶¶ 32, 39.

20. *See Khulumani* Complaint ¶ 38. Rheinmetall contests personal jurisdiction and the effectiveness of service under the Hague Convention. *See* 12/4/08 Letter from Jerome S. Hirsch, counsel for Rheinmetall, to the Court. Those issues have been stayed until after resolution of the instant motion to dismiss.

secondary violations of the law of nations by engaging in workplace discrimination that mimicked and enhanced apartheid, suppressing union activities, manufacturing military vehicles for the South African security forces in the face of worker protests, and assisting security forces in identifying and torturing anti-apartheid leaders.[21] The *Ntsebeza* plaintiffs additionally allege that defendant IBM—or its agents or alter egos—committed secondary violations of the law of nations by providing the computer hardware, software, maintenance, and support necessary for the South African Government to carry out geographic segregation and denationalization.[22] Finally, the *Ntsebeza* plaintiffs allege that defendant Barclays—or its agents or alter egos—directly and indirectly violated the law of nations through its employment practices, which furthered the geographic segregation of the races as well as economic marginalization of black South Africans.[23]

The *Khulumani* plaintiffs allege that the automotive defendants aided and abetted violations of the law of nations by supplying vehicles, parts, and other equipment to the apartheid security forces.[24] The *Khulumani* plaintiffs additionally allege that the technology defendants aided and abetted violations of the law of nations by providing the computer systems necessary to restrict black South Africans' movements, track dissidents, and target particular individuals for repressive acts.[25] The *Khulumani* plaintiffs also allege that the banking defendants aided and abetting violations of the law of nations by providing financial support to the apartheid regime and the security forces through the purchase of bonds and the provision of loans, as well as by permitting directors to serve on an advisory board to the South African Defense Forces.[26] Finally, the *Khulumani* plaintiffs allege that Rheinmetall aided and abetted violations of the law of nations by providing armaments and military equipment necessary to suppress dissent, control the population, and carry out extrajudicial killings.[27]

## B. Procedural Background

These proceedings began as over a dozen distinct cases; the two that remain were filed in 2002. A combination of individual claims and putative class actions, the cases alleged both direct and secondary tort liability for violations of customary international law perpetrated in apartheid South Africa. On December 20, 2002, the United States Judicial Panel on Multidistrict Litigation centralized pretrial proceedings before Judge John E. Sprizzo of the Southern District of New York.[28] On July 14, 2003, defendants who did not contest personal jurisdiction moved to dismiss the actions.[29] On November 29, 2004,

21. *See Ntsebeza* Complaint ¶¶ 54–99, 101–127.

22. *See id.* ¶¶ 129–140.

23. *See id.* ¶¶ 142–145.

24. *See Khulumani* Complaint ¶ 254.

25. *See id.* ¶ 202.

26. *See id.* ¶¶ 149, 153, 159.

27. *See id.* ¶¶ 178, 198.

28. *See* MDL Transfer Order, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 1 (S.D.N.Y. Dec. 20, 2002). On December 16, 2008, Judge Sprizzo died. These cases was reassigned for further pretrial proceedings on December 23, 2008. *See* Notice of Case Reassignment, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 112 (S.D.N.Y. Dec. 23, 2008).

29. *See* Notice of Defendants' Joint Motion, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 41, 2003 WL 25654355 (S.D.N.Y. July 14, 2003). On July 31, 2003, Judge Sprizzo stayed motions to dismiss related to service of process and personal jurisdiction.

Judge Sprizzo granted defendants' motion to dismiss in full on the grounds that aiding and abetting liability is not available under the ATCA.[30]

Plaintiffs appealed to the Second Circuit, and on October 12, 2007, the Circuit affirmed in part and reversed in part.[31] In a short per curiam opinion, the Circuit upheld dismissal of plaintiffs' claims under the TVPA and held that these cases failed to meet the requirements of diversity jurisdiction.[32] However, the Circuit reinstated plaintiffs' ATCA claims, expressly holding that "a plaintiff may plead a theory of aiding and abetting liability under the ATCA."[33] Moreover, the Circuit vacated the lower court's holding that prudential concerns warranted dismissal and remanded for further analysis.[34]

Each judge on the panel filed a lengthy concurring opinion. Judge Robert Katzmann, concurring, wrote that secondary liability standards for torts recognized under the ATCA should be determined based on customary international law.[35] Judge Peter Hall, concurring, wrote that such analysis is a matter of federal common law.[36] Judge Edward Korman, concurring in part and dissenting in part, wrote that secondary liability standards should be determined based on customary international law but that aiding and abetting liability is not sufficiently established under customary international law.[37] Moreover, Judge Korman argued at length that these cases should have been dismissed on numerous other independent grounds, including the political question doctrine, international comity, and an absence of liability for corporate defendants under customary international law.[38]

Defendants next petitioned to the Supreme Court for a writ of certiorari, but four justices recused themselves. As the Court was unable to muster the requisite quorum of six justices, it affirmed the decision of the Second Circuit in a non-precedential summary order.[39]

---

See Transcript, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499 (S.D.N.Y. July 31, 2003).

**30.** See *In re S. Afr. Apartheid Litig.*, 346 F.Supp.2d 538 (S.D.N.Y.2004), *rev'd sub nom.*, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir.2007) (per curiam). Judge Sprizzo additionally dismissed the *Ntsebeza* plaintiffs' non-ATCA claims under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b)-(d). *See id.* at 555–57.

**31.** See *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir.2007) (per curiam).

**32.** See *id.* at 259–60 (finding that plaintiffs failed to plead allegations sufficient to meet the "color of law" requirement of the TVPA, 28 U.S.C. § 1350 (note)); *id.* at 260 (finding an absence of diversity jurisdiction).

**33.** *Id.* at 260.

**34.** See *id.* at 261–64. The Circuit expressly noted that if plaintiffs narrowed their allegations upon remand, the calculus concerning comity and the political question doctrine would change significantly. *See id.* at 263. Such changes might even warrant re-solicitation of the views of the Executive Branch and the Government of South Africa. *See id.* at 263 n. 13.

**35.** See *id.* at 264–84 (Katzmann, J., concurring).

**36.** See *id.* at 284–92 (Hall, J., concurring).

**37.** See *id.* at 319–21 (Korman, J., concurring in part and dissenting in part). Judge Edward R. Korman of the Eastern District of New York sat on the panel by designation.

**38.** See *id.* at 295–311 (Korman, J., concurring in part and dissenting in part) (political question and comity); *id.* at 321–26 (Korman, J., concurring in part and dissenting in part) (corporate liability).

**39.** See *American Isuzu Motors, Inc. v. Ntsebeza*, —— U.S. ——, 128 S.Ct. 2424, 171 L.Ed.2d 225 (2008) (affirming under 28 U.S.C. § 2109).

On remand to the district court, plaintiffs filed the two amended, consolidated Complaints that now constitute the entirety of this litigation: *Khulumani v. Barclays National Bank Ltd.* and *Ntsebeza v. Daimler A.G.* (which incorporates the allegations of *Digwamaje v. IBM Corporation*, another major case within this multidistrict litigation).[40] On December 8, 2008, all defendants but Rheinmetall filed the instant motion to dismiss.[41]

## III. LEGAL STANDARDS

### A. Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must " 'accept as true all of the factual allegations contained in the complaint' "[42] and "draw all reasonable inferences in the plaintiff's favor."[43] A complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level' "[44] in order to survive a motion to dismiss. Although the complaint need not provide "detailed factual allegations,"[45] it must nonetheless "amplify a claim with some factual allegations ... to render the claim *plausible*."[46] "[B]ald assertions and conclusions of law will not suffice."[47]

### B. The Alien Tort Claims Act

Plaintiffs claim jurisdiction in this Court under the ATCA based on torts committed in violation of customary international law. The statute states in its entirety, "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[48] In 1980, the Second Circuit

---

**40.** *See Ntsebeza* Complaint ¶ 6 n.1. On September 25, 2008, the Court granted plaintiffs leave to file amended complaints. *See* Order, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 90 (S.D.N.Y. Sept. 25, 2008). Plaintiffs filed their amended complaints on October 24, 2008 and October 27, 2008. *See Khulumani* Complaint, 02 MDL 1499, Docket No. 94 (S.D.N.Y. Oct. 24, 2008); *Ntsebeza* Complaint, 02 MDL 1499, Docket No. 126 (S.D.N.Y. Oct. 27, 2008).

**41.** *See* Notice of Joint Motion to Dismiss, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 106 (S.D.N.Y. Dec. 8, 2008).

**42.** *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1975, 167 L.Ed.2d 929 (2007)).

**43.** *Ofori–Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir.2006).

**44.** *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly*, 127 S.Ct. at 1965). *Accord Erickson*, 127 S.Ct. at 2200 (noting that plaintiffs must " 'give the defendant fair notice of what the

... claim is and the grounds upon which it rests' ") (quoting *Twombly*, 127 S.Ct. at 1955).

**45.** *Twombly*, 127 S.Ct. at 1970.

**46.** *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir.2007), *cert. granted*, —— U.S. ——, 128 S.Ct. 2931, 171 L.Ed.2d 863 (2008).

**47.** *Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*, 309 F.3d 71, 74 (2d Cir.2002) (citation omitted).

**48.** 28 U.S.C. § 1350. *Accord Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1995) (holding that the ATCA "confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations."). The statute's origins lie in the Judiciary Act of 1789, which provided that "the new federal district courts 'shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States.' " *Sosa v. Alvarez–Machain*, 542 U.S. 692, 712, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (quoting Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 77).

held in *Filártiga v. Peña–Irala* that the ATCA conveys jurisdiction for civil claims concerning violations of "universally accepted norms of the international law of human rights, regardless of the nationality of the parties." [49] In 2004, the Supreme Court upheld the core of *Filártiga* in *Sosa v. Alvarez–Machain*. The Court also provided important guidance concerning the function of the ATCA.

■ At its core, the ATCA is a grant of jurisdiction. However, the ATCA performs a broader role than authorizing federal courts to hear cases brought under statutorily defined torts or self-executing treaties. Rather, pursuant to the ATCA, federal courts may "hear claims in a very limited category defined by the law of nations and recognized at common law." [50] When the First Congress passed the ATCA in 1789, three such offenses had been expressly identified in Blackstone's *Commentaries*: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." [51] The Second Circuit has recognized several additional common law torts defined by customary international law. [52]

## IV. EXTRATERRITORIALITY

■ Defendants argue that the ATCA does not provide this Court with jurisdiction to address torts stemming from extraterritorial events. [53] The vast majority of acts described in the Complaints occurred outside of the United States. [54] However, that is no bar to this Court's jurisdiction.

■ "Legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." [55] However, "[i]t is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction." [56] The ATCA is a jurisdictional provision and grants authority only to "[t]he district courts," [57] which are uniformly found on U.S. soil. The ATCA

---

49. 630 F.2d 876, 878 (2d Cir.1980).

50. *Sosa,* 542 U.S. at 712, 124 S.Ct. 2739.

51. *Id.* at 716, 124 S.Ct. 2739 (citing William Blackstone, 4 *Commentaries* *68).

52. *See, e.g., Filártiga,* 630 F.2d at 880 ("[W]e find that an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations.").

53. *See* Memorandum of Law in Support of Defendants' Joint Motion to Dismiss ("Def. Mem.") at 38–40.

54. *See, e.g., Ntsebeza* Complaint ¶ 55 (alleging that Daimler management in Germany managed the provision of military vehicles to the South African Security Forces); *Khulumani* Complaint ¶¶ 273–274, 299 (alleging that GM participated in the production of armor-plated vehicles with military fixtures in South African facilities). *But see, e.g., Ntsebeza* Complaint ¶ 141 (alleging that IBM worked within the United States to sell technology parts and services to the South African Government even after it had divested from its South African subsidiary).

55. *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). *Accord Foley Bros. v. Filardo,* 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949) (applying this principle as a statutory presumption). *See generally* William N. Eskridge, Jr. and Philip P. Frickey, *Foreward: Law as Equilibrium,* 108 Harv. L.Rev. 26, 107 (1994) (noting the existence of a common law-based canon of statutory interpretation against extraterritorial application of U.S. law, except for antitrust laws).

56. *Filartiga,* 630 F.2d at 885. *Accord McKenna v. Fisk,* 42 U.S. (1 How.) 241, 248–49, 11 L.Ed. 117 (1843) (noting that English courts were open to foreigners bringing civil torts, even against other foreigners found in England, for torts committed outside of England or its empire).

57. 28 U.S.C. § 1350.

does not by its own terms regulate conduct; rather it applies universal norms that forbid conduct regardless of territorial demarcations or sovereign prerogatives.[58] Therefore, unlike the application of specific rules formulated by American legislators or jurists,[59] the adjudication of tort claims stemming from acts committed abroad will not generate conflicting legal obligations, and there is a substantially reduced likelihood that adjudication will legitimately offend the sovereignty of foreign nations.[60]

In *Wiwa v. Royal Dutch Petroleum Co.*, the Second Circuit stated that "the text of the [ATCA] seems to reach claims for international human rights abuses occurring abroad."[61] While this pronouncement may not be a definitive statutory analysis, the Circuit's statement—read in concert with its rejection of *forum non conveniens* as a bar to adjudication of torts in violation of the law of nations based on extraterritorial acts[62]—permits this Court to entertain ATCA claims based on extraterritorial conduct. Moreover, the Ninth Circuit has squarely held that a court's jurisdiction to hear claims under the ATCA is not limited by "the locus of the injury."[63] Numerous other district courts

have adjudicated ATCA claims arising from extraterritorial events.[64] Given the universal agreement of federal courts, as well as the inapplicability of the presumption against extraterritorial application of statutes, defendants' extraterritoriality defense is rejected. The ATCA provides this Court with the authority to hear claims for torts committed abroad, including the allegations at issue in this case.

## V. RECOGNIZED TORTS

The Complaints allege that defendants have committed a panoply of torts, under both direct and secondary liability theories. Specifically, the *Ntsebeza* plaintiffs allege apartheid, under direct, aiding and abetting, and conspiracy theories; denial of the right to a nationality, under aiding and abetting and conspiracy theories; extrajudicial killing, under aiding and abetting and conspiracy theories; torture, under aiding and abetting and conspiracy theories; and cruel, inhuman, or degrading treatment ("CIDT"), under direct, aiding and abetting, and conspiracy theories.[65] The *Khulumani* plaintiffs allege apartheid, extrajudicial killing, torture, prolonged un-

**58.** *Cf. Convention on Torture: Hearing before the S. Comm. on Foreign Relations*, 100th Cong. 8 (1990) (statement of Abraham Sofaer, Legal Advisor, United States Department of State) ("[A]s a member of the international community, we must stand with other nations in pledging to bring to justice those who engaged in torture whether in U.S. territory or in the territory of other countries.").

**59.** *Cf. Arabian Am. Oil Co.*, 499 U.S. at 248, 256, 111 S.Ct. 1227 (noting the need to avoid conflict with foreign laws).

**60.** *Cf. The Apollon*, 22 U.S. (9 Wheat.) 362, 370, 6 L.Ed. 111 (1824) (expressing limitations on the legal authority of one nation to extend its law beyond its borders). *See also* Part VIII, *infra* (discussing the application of prudential concerns to the cases at bar).

**61.** 226 F.3d 88, 105 n. 10 (2d Cir.2000).

**62.** *See id.* at 100 (noting that *forum non conveniens* analysis is necessary only if the court is " 'a permissible venue with proper jurisdiction over the claim' ") (quoting *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir.1998)).

**63.** *Trajano v. Marcos*, 978 F.2d 493, 500 (9th Cir.1992).

**64.** *See, e.g., Bowoto v. Chevron*, No. 99 Civ. 2506, 2009 WL 593872 (N.D.Cal. Mar. 4, 2009) (noting completion of a jury trial in an ATCA case addressing extrajudicial killing in Nigeria).

**65.** *See Ntsebeza* Complaint ¶¶ 159–185.

lawful detention, and CIDT, all under aiding and abetting and conspiracy theories.[66]

Defendants do not contest that many of these torts are cognizable under international law. However, they dispute the existence of causes of action for apartheid by a non-state actor[67] and for denial of the right to a nationality by a state actor.[68] Moreover, although defendants do not contest the existence of customary international law forbidding CIDT, this Court must outline the scope of that prohibition in order to assess the sufficiency of plaintiffs' allegations. Finally, defendants assert that the law of nations does not recognize corporate liability for any of these torts.[69]

## A. Applicable Law
### 1. Recognition of Torts Under the Law of Nations

 As noted earlier, at the time Congress enacted the ATCA, three torts were recognized at common law as violations of the law of nations: "violation of safe conducts, infringement of the rights of ambassadors, and piracy."[70] Customary international law has evolved significantly in the more than two hundred years since

passage of the First Judiciary Act. As a result, the number of torts that violate the law of nations has increased, and Congress has erected no barrier to their recognition under the ATCA.[71] A tort that violates customary international law will be recognized if

> the norm alleged (1) is defined with a specificity comparable to the 18th-century paradigms discussed in *Sosa*, (2) is based upon a norm of international character accepted by the civilized world, and (3) is one that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern.[72]

"[T]he door is still ajar subject to vigilant doorkeeping."[73] Both private individuals and those acting under the color of law may be liable for violations of customary international law,[74] but the question of whether tort liability exists is distinct for each category of defendant.[75] Moreover, a defendant is liable solely with regard to international norms in effect at the time of the allegedly tortious act.[76]

Under this rubric, the Second Circuit has recognized tort liability for torture, genocide, and war crimes committed by

**66.** See *Khulumani* Complaint ¶¶ 303–441.

**67.** See Def. Mem. at 14–15.

**68.** See *id.* at 20.

**69.** See *id.* at 40–42.

**70.** *Sosa*, 542 U.S. at 716, 124 S.Ct. 2739 (citing William Blackstone, 4 *Commentaries* *68).

**71.** See *id.* at 725, 124 S.Ct. 2739.

**72.** *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 174–75 (2d Cir.2009). *Accord Filartiga*, 630 F.2d at 878 (finding that the ATCA confers jurisdiction concerning "universally accepted norms of the international law of human

rights, regardless of the nationality of the parties").

**73.** *Sosa*, 542 U.S. at 729, 124 S.Ct. 2739. *Accord Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 248 (2d Cir.2003) ("[I]n determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint.").

**74.** See *Kadic*, 70 F.3d at 239.

**75.** See *Sosa*, 542 U.S. at 732 n. 20, 124 S.Ct. 2739.

**76.** See *Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 120 (2d Cir.2008) (noting plaintiffs' concession that it was not clearly established that defendants' conduct during the Vietnam War

both state and non-state actors.[77] Moreover, a state actor may be held liable for the tort of "large-scale, nonconsensual drug testing on humans."[78] The Ninth Circuit has recognized additional causes of action against state actors for summary execution and prolonged and arbitrary detention[79] and against non-state actors for forced labor.[80]

However, not every claim asserted to be a tort in violation of customary international law has been recognized as actionable under the federal courts' ATCA jurisdiction. In *Sosa*, the Supreme Court held that short-term arbitrary detention does not trigger tort liability.[81] The Second Circuit has declined to recognize torts in violation of international law for private racial or religious discrimination,[82] violation of a "right to life or right to health,"[83] failure to provide consular notification and

access after arrest,[84] and regulatory takings,[85] and the Ninth Circuit has declined to recognize a tort in violation of the law of nations for simple fraud.[86] The Eleventh Circuit has also declined to recognize a cause of action for CIDT.[87]

■■■ "[T]he usage and practice of States—as opposed to judicial decisions or the works of scholars—constitute the primary sources of customary international law."[88] When determining whether to recognize a tort in violation of customary international law, however, a court makes a holistic assessment of state practice along with international legal materials, treaties, and proclamations.[89] Although adherence to rules articulated in a particular source of law need not be absolute,[90] some international legal instruments will have little to no evidentiary weight when

violated norms of customary international law established prior to 1975).

77. *See Kadic*, 70 F.3d at 239 (quoting Restatement (Third) of the Foreign Relations Law of the United States §§ 404, 702).

78. *Abdullahi*, 562 F.3d at 185–87.

79. *See In re Estate of Marcos*, 25 F.3d 1467, 1475 (9th Cir.1994).

80. *Doe v. Unocal Corp.*, 395 F.3d 932, 946–47 (9th Cir.2002), *dismissed by stipulation pending rehearing en banc*, 403 F.3d 708 (9th Cir. 2005).

81. *See Sosa*, 542 U.S. at 736, 124 S.Ct. 2739 (noting that Alvarez–Machain was detained unlawfully for no more than a day).

82. *See Bigio v. Coca–Cola*, 239 F.3d 440 (2d Cir.2001).

83. *Flores*, 414 F.3d at 254.

84. *See Mora v. New York*, 524 F.3d 183 (2d Cir.2008).

85. *See Zapata v. Quinn*, 707 F.2d 691 (2d Cir.1983).

86. *See Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir.1995).

87. *See Aldana v. Del Monte Fresh Produce, N.A.* ("*Aldana I*"), 416 F.3d 1242, 1247 (11th Cir.2005) (per curiam).

88. *Flores*, 414 F.3d at 250 (citing *United States v. Yousef*, 327 F.3d 56, 99–103 (2d Cir.2003)).

89. *See Abdullahi*, 562 F.3d at 179–81 (holding that sources of international law that cannot alone establish torts are still "potent authority for universal acceptance of" a norm). *See also Flores*, 414 F.3d at 252 (noting "that recourse may be had to secondary sources such as 'unilateral declarations, instructions to diplomatic agents, laws and ordinances, and *in a lesser degree*, to the writings of authoritative jurists,' as evidence of the 'acts' and 'practice[s]' of States.' ") (quoting Clive Parry, *The Sources and Evidences of International Law* 2 (1965)); *Kadic*, 70 F.3d at 239 (relying almost entirely on the Restatement (Third) of the Foreign Relations Law of the United States).

90. *See Flores*, 414 F.3d at 248 ("Of course, States need not be universally successful in

determining the universal law of nations.[91]

### 2. Corporate Liability

Footnote twenty of *Sosa v. Alvarez–Machain* anticipated that suits under the ATCA might be brought against "an individual actor such as a corporation or individual" and noted the need for separate analysis of the applicability of particular norms of customary international law to state and nonstate actors.[92] Although relying on pre-*Sosa* cases, Judge Katzmann wrote in his *Khulumani* concurrence that decisions of the Second Circuit "have repeatedly treated the issue of whether corporations may be held liable under the ATCA as indistinguishable from the question of whether private individuals may be."[93] Other circuits have also implicitly extended ATCA liability to corporations.[94]

### B. Discussion

### 1. Apartheid by a Non–State Actor

■ "Racial discrimination is a violation of customary law when it is practiced systematically as a matter of state policy."[95]

However, private racial discrimination alone, "[h]owever reprehensible," does not violate customary international law.[96] Plaintiffs contend that context matters; in the context of apartheid, private racial discrimination, denial of the right to work, freedom of expression, and freedom of association constitute acts of apartheid by a non-state actor. Nonetheless, this claim does not meet the requisite standard of specificity, international character, and universal acceptance based on "legal obligation and mutual concern." [97]

Plaintiffs advance two international legal instruments as the source of their claim: the International Convention on the Suppression and Punishment of the Crime of Apartheid ("the Apartheid Convention") and the Rome Statute of the International Criminal Court ("ICC").[98] However, the Apartheid Convention is not a persuasive source for the determination of a norm of international character accepted by the civilized world.[99] Despite near-universal condemnation of apartheid, Western European and North American countries have

---

implementing the principle in order for a rule of customary international law to arise.").

91. *See id.* at 257 (noting that the evidentiary weight of a treaty increases as more countries ratify it and those countries implement and abide by its principles). *See also* Restatement (Third) of the Foreign Relations Law of the United States § 102(3) (noting that international agreements create customary international law only when "such agreements are intended for adherence by states generally and are in fact widely accepted").

92. 542 U.S. at 732 n. 20, 124 S.Ct. 2739.

93. *Khulumani,* 504 F.3d at 282 (Katzmann, J., concurring) (citing *Bigio,* 239 F.3d at 447; *Flores,* 414 F.3d at 244).

94. *See Aldana I,* 416. F.3d at 1247–48; *Doe v. Unocal Corp.,* 395 F.3d at 945–46; *Beanal v. Freeport–McMoran, Inc.,* 197 F.3d 161, 163 (5th Cir.1999).

95. Restatement (Third) of the Foreign Relations Law of the United States § 702, cmt. i. *Accord Presbyterian Church of Sudan v. Talisman Energy, Inc.* (*"Talisman I"*), 244 F.Supp.2d 289, 305 (S.D.N.Y.2003), *appeal pending* No. 07–0016 (2d Cir. argued Jan. 12, 2009).

96. *Bigio,* 239 F.3d at 448.

97. *Abdullahi,* 562 F.3d at 174–75.

98. *See* International Convention on the Suppression and Punishment of the Crime of Apartheid, 13 I.L.M. 50, 1015 U.N.T.S. 243 (1976); Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, 2187 U.N.T.S. 90.

99. *See generally Khulumani,* 504 F.3d at 319–20 (Korman, J., concurring in part and dissenting in part) (describing the weakness of the Apartheid Convention as a source of customary international law).

neither signed nor ratified the treaty.[100] This illustrates substantial international conflict concerning acceptance of the precise norms articulated in the text of the Apartheid Convention.[101] Moreover—according to State Department reports—a substantial proportion of the nations that have ratified the Apartheid Convention have poor human rights records.[102] A treaty signed by countries that routinely violate human rights obligations is less likely to articulate norms that those countries "abide by, or accede to, out of a sense of legal obligation." [103]

Therefore the sole remaining potential source for a tort of apartheid by a non-state actor is the Rome Statute, which defines the crime of apartheid as

> inhumane acts ... committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime.[104]

Inhumane acts are further defined as actions of a character similar to murder, extermination, enslavement, deportation, imprisonment, torture, sexual violence, persecution against any identifiable group, or enforced disappearance.[105]

Theoretically, a private act of apartheid may be described with the requisite degree of specificity. The elements of private apartheid would be (1) persecution against any identifiable group (2) committed in the context of an institutionalized regime of systemic racial discrimination (3) with the intention of maintaining that regime.

This reading of the Rome Statute is strained to say the least; a more reasonable interpretation of that statute would require a combination of acts similar to those defined by statute as inhumane. Moreover, the need for such particularized analysis of a single international legal instrument demonstrates that private apartheid is not a uniformly-accepted prohibition of international character. Although the establishment of state-sponsored apartheid and the commission of inhumane acts needed to sustain such a system is indisputably a tort under customary international law,[106] the international legal system has not thus far definitively established liability for non-state actors who follow or

---

100. *See* United Nations, Office of the High Commissioner for Human Rights, *Status of Ratification, ICSPCA*, http://www.unhchr.ch/html/menu3/b/treaty8_asp.htm.

101. *See* Restatement (Third) of the Foreign Relations Law of the United States § 102(2) (noting that customary international law is only the firm consensus of the community of developed nations).

102. *Compare Status of Ratification, ICSPCA*, *with* United States Department of State, *2008 Country Reports on Human Rights Practices*, *available at* http://www.state.gov/g/drl/rls/hrrpt/2008/index.htm, and Office of the High Commissioner for Human Rights, United Nations, *Human Rights in the World*, *available at* http://www.ohchr.org/EN/Countries/Pages/HumanRightsintheWorld.aspx. The State Department's *2008 Country Reports on Human Rights Practices* for signatories contain statements such as "The government's human rights record remained poor," "The government[] ... continued to commit numerous serious abuses," and "The government continued to engage in the pervasive and systematic abuse of human rights." Of course not every ratifier of the Apartheid Convention routinely violates human rights.

103. *Abdullahi*, 562 F.3d at 174–75.

104. Rome Statute art. 7(2)(h).

105. *See id.* art. 7(1).

106. *See Khulumani*, 504 F.3d at 273 (Katzmann, J., concurring) (describing apartheid as a "fundamental human rights concern," alongside torture, slavery, and genocide, all recognized torts when committed by a state actor).

even further state-sponsored racial oppression. Therefore, this Court declines to recognize a tort of apartheid by a non-state actor. The *Ntsebeza* plaintiffs' direct liability claims must be dismissed.

### 2. Arbitrary Denationalization by a State Actor

■ No federal case has addressed whether arbitrary denationalization by a state actor is a tort in violation of customary international law. However, this prohibition is defined with specificity, is based upon an accepted international norm, and is nearly universally accepted out of both "legal obligation and mutual concern." The Restatement (Third) of the Foreign Relations Law of the United States notes,

> Traditional international law did not question the authority of a state to terminate the nationality of any of its nationals. Increasingly, the law has accepted some limitations on involuntary termination of nationality, both to prevent statelessness and in recognition that denationalization can be an instrument of racial, religious, ethnic, or gender discrimination, or of political repression.[107]

From this statement, definite elements of a tort may be recognized. A state actor commits arbitrary denationalization if it terminates the nationality of a citizen either arbitrarily or on the basis of race, religion, ethnicity, gender, or political beliefs.

The wealth of international legal instruments articulating a prohibition against arbitrary denationalization indicates both the international nature of the norm and the breadth of its acceptance. In 1907, the Hague Convention Respecting the Laws and Customs of War on Land first articulated that individuals have a right to retain their citizenship, even in the face of a hostile invasion.[108] Soon thereafter, the United States representative to a 1916 conference concerning the codification of international law stated, "The scope of municipal law governing nationality must be regarded as limited by consideration of the rights and obligations of individuals and other states."[109] Since then the United States has joined over a hundred other nations in signing and ratifying the International Convention on the Elimination of All Forms of Racial Discrimination, which recognizes that a country may not deprive citizens of their nationality on the basis of race.[110] Finally, broadly accepted regional international legal materials repeat this prohibition.[111]

---

**107.** Restatement (Third) of Foreign Relation Law § 211 cmt. e (1987).

**108.** *See* Fourth Hague Convention Respecting the Laws and Customs of War on Land art. 45, Oct. 18, 1907, 36 Stat. 2277, 2306.

**109.** 1 Conference for the Codification of International Law, *Bases of Discussion* 16 (1916), *quoted in* Hersch Lauterpacht, *International Law: Collected Papers of Hersch Lauterpacht* 392 (Elihu Lauterpacht ed., 1970).

**110.** International Convention on the Elimination of All Forms of Racial Discrimination art. 5, § d(iii), opened for signature Mar. 7, 1966, S. Exec. Doc. C, 95–2 (1978), 5 I.L.M. 350, 356 (entered into force Jan. 4, 1969). Every memberstate of the United Nations with the exception of the United States and Somalia has also ratified the Convention on Rights of the Child, which also recognizes this norm. *See* United Nations Convention on the Rights of the Child art. 8, § a, Nov. 20, 1989, 1577 U.N.T.S. 3, 28 I.L.M. 1448, 1460 (entered into force Sept. 2, 1990).

**111.** *See* European Convention on Nationality art. 4(a), Nov. 6, 1997, 37 I.L.M. 44, 48 ("[N]o one shall be arbitrarily deprived of his or her nationality"); American Convention on Human Rights art. 20, opened for signature Nov. 22, 1969, 9 I.L.M. 99, 107 ("No one shall be arbitrarily deprived of his nationality or of the right to change it."). The United States has signed the American Convention on Human Rights but has not yet ratified it. *See* Diane

The bar on arbitrary denationalization reflects both "legal obligation and mutual concern." States face condemnation for violating this norm, including suit in the International Court of Justice.[112] Moreover, as the Restatement notes, the prohibition on arbitrary denationalization reflects international concern regarding the existence of stateless persons.[113] In short, I conclude that the tort of arbitrary denationalization satisfies the Second Circuit's test for recognition of a tort in violation of the law of nations.

### 3. Cruel, Inhuman, or Degrading Treatment[114]

The international norm forbidding CIDT is enshrined in the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), a nearly-universally accepted multilateral treaty.[115] CAT states,

> Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which

do not amount to torture . . ., when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.[116]

However, the widespread acceptance of the CAT does not render all cruel, degrading, or even inhuman state conduct a violation of the law of nations. CIDT is the intentional infliction of mental or physical suffering, anguish, humiliation, fear, or debasement against a person in the offender's custody or control that nevertheless falls short of torture. This definition rests on the use of the term in both international and American law, as explained below.

The custody or control requirement, as well as the relationship between CIDT and torture, are evident throughout international law. The Rome Statute's sole reference to CIDT is found in article 55, which addresses the "Rights of persons during an investigation." [117] Specifically, the Rome Statute describes CIDT as an omnibus category covering abuses such as "coercion, duress or threat to torture." [118]

---

Marie Amann, *International Law and Rehnquist–Era Reversals*, 94 Geo. L.J. 1319, 1322 n.23 (2006). *See also* Nadia Ezzelarab & Brian Tittemore, *Round Table Discusses U.S. Ratification of Inter-American Convention on Human Rights*, Human Rights Brief (1994) (noting that the United States' failure to ratify the treaty stemmed from objections concerning the death penalty and abortion).

**112.** *See, e.g., Application of the International Convention on the Elimination of All Forms of Racial Discrimination (Georgia v. Russ.)*, Transcript, CR 2008/22, at 24 (I.C.J. Sept. 8, 2008) (outlining allegations concerning denationalization).

**113.** *See* Restatement (Third) of Foreign Relation Law § 211 cmt. e (1987). *See also* Convention Relating to the Status of Stateless Persons, Sept. 28, 1954, 189 U.N.T.S. 150.

**114.** As noted above, defendants do not contest the existence of a tort under the law of nations for CIDT. Moreover, although the Elev-

enth Circuit has declined to exercise ATCA jurisdiction over such a claim, *see Aldana I*, 416 F.3d at 1247, I find Judge Rosemary Barkett's dissent to the denial of *en banc* review of that decision quite persuasive. *See Aldana v. Del Monte Fresh Produce, N.A. ("Aldana II")*, 452 F.3d 1284, 1284–89 (11th Cir. 2006) (Barkett, J., dissenting).

**115.** *See* CAT, Dec. 10, 1984, 108 Stat. 382, 1465 U.N.T.S. 85. *See also* United Nations Treaty Collection, *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, http://treaties.un.org/Pages/ViewDetails.aspx?src=UNTSONLINE & tabid=2 & id=129 & chapter=4 & lang=en (noting the ratification history of the treaty).

**116.** CAT art. 16, § 1.

**117.** Rome Statute art. 55.

**118.** *Id.* art. 55(b). *Accord* Restatement (Third) of the Foreign Relations Law of the

The Restatement (Third) of the Foreign Relations Law of the United States clarifies the concept of CIDT by noting, "The difference between torture and cruel, inhuman, or degrading treatment or punishment 'derives principally from a difference in the intensity of the suffering inflicted.' "[119]

This definition is further buttressed by uses of the term CIDT in domestic law. The Detainee Treatment Act of 2005 states, "No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment."[120] Similarly, Executive Order 13,440 addresses the meaning of CIDT in relation to CIA interrogation procedures.[121] Other domestic references to CIDT repeatedly address CIDT alongside torture,[122] which by definition must be carried out "upon another person within [the offender's] custody or physical control."[123]

### 4. Corporate Liability

Defendants allege that apart from the inquiry into whether customary international law creates liability for state and non-state actors, this Court must determine whether torts in violation of the law of nations apply to corporations.[124] However, defendants aim to reopen a long-settled question in this Circuit. On at least nine separate occasions, the Second Circuit has addressed ATCA cases against corporations without ever hinting—much less holding—that such cases are barred.[125]

United States § 702(d) (noting that a state violates customary international law if it practices "torture or other cruel, inhuman, or degrading treatment or punishment"). *Cf.* International Covenant on Civil and Political Rights art. 7, Dec. 19, 1966, 999 U.N.T.S. 171 ("No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation."). Although it is possible for non-consensual medical experimentation to occur outside the context of captivity, *see Abdullahi*, 562 F.3d at 185–87, this injunction is generally considered a prohibition against torture and the mistreatment of detainees. *See, e.g.,* Eric Posner, *Human Welfare, Not Human Rights,* 108 Colum. L.Rev. 1758, 1773 n.66 (2008) (describing this provision as a "ban on torture"); Roberto Andorno, *Global Bioethics and Human Rights,* 27 Med. & L. 1, 2–3 (2008) (noting the origins of this provision in "the abusive treatment of concentration camp prisoners by Nazi medical doctors").

**119.** Restatement (Third) of the Foreign Relations Law of the United States § 702 Reporter's Note 5 (quoting *Ireland v. United Kingdom,* 25 Eur. Ct. Hum. Rts. (ser. A) ¶ 167 (1978)).

**120.** 42 U.S.C. § 2000dd(a).

**121.** *See* Executive Order No. 13,440, § 2(c), 72 F.R. 40707 (July 20, 2007) (defining CIDT as "the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States").

**122.** *See, e.g.,* 22 U.S.C. § 262d(a)(1) (directing that development aid be channeled to countries that do not engage in "torture or cruel, inhumane, or degrading treatment or punishment, prolonged detention without charges, or other flagrant denial to life, liberty, and the security of person"); *id.* § 6402 (defining "particularly severe violations of religious freedom" to include "torture or cruel, inhuman, or degrading treatment or punishment").

**123.** War Crimes Act, 18 U.S.C. § 2441(d)(1)(A). *Accord* TVPA, 28 U.S.C. § 1350 note, § 3(b)(1).

**124.** *See* Def. Mem. at 40–42.

**125.** *See Abdullahi,* 562 F.3d at 174–75; *Vietnam Ass'n for Victims of Agent Orange,* 517 F.3d at 108; *Khulumani,* 504 F.3d at 282 (Katzmann, J., concurring); *Flores,* 414 F.3d at 244; *Bano v. Union Carbide Corp.,* 361 F.3d 696 (2d Cir.2004); *Aguinda v. Texaco, Inc.,* 303 F.3d 470 (2d Cir.2002); *Bigio,* 239 F.3d at 447; *Wiwa,* 226 F.3d at 104; *Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir.1998).

Regardless of the position that this Court might take if the issue of corporate liability were unresolved, this Court is bound by the decisions of the Second Circuit.

 Moreover, in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, Judge Denise Cote of the Southern District of New York wrote two lengthy and persuasive explanations of the basis for corporate liability in ATCA cases.[126] This Court need not repeat her analysis. Under the jurisprudence of this Circuit, corporations are liable in the same manner as natural persons for torts in violation of the law of nations.[127]

## VI. SECONDARY LIABILITY STANDARDS

Plaintiffs' remaining claims do not allege direct violations of the law of nations. Rather, they assert that defendants aided and abetted violations of the law of nations committed by the apartheid government

that ruled South Africa from 1948 to 1994. Although the Second Circuit held in this case that "a plaintiff may plead a theory of aiding and abetting liability under the ATCA,"[128] the division of opinion between the two authors of the per curiam opinion left this Court without a standard to apply or even a decision concerning the source of law from which this Court should derive a standard.[129] In addition, the Second Circuit did not address the existence of conspiratorial liability under the ATCA, let alone the elements of such a claim.

### A. Source of Law

Defendants contend that standards concerning secondary liability must be determined based on customary international law.[130] Plaintiffs assert that secondary liability standards are properly derived from federal common law and—more importantly—that this initial inquiry is irrelevant because the results of the inquiries are the same.[131] Although cases in this Circuit

---

**126.** *See Talisman I* 244 F.Supp.2d at 308–19; *Presbyterian Church of Sudan v. Talisman Energy, Inc.* (*"Talisman II"*), 374 F.Supp.2d 331, 335–37 (S.D.N.Y.2005), *appeal pending* No. 07–0016 (2d Cir. argued Jan. 12, 2009).

**127.** Notably, the Second Circuit requested additional briefing on this precise question during oral argument in *Talisman. See* 1/22/09 Letter from Carey R. D'Avino, appellants' attorney, to the Court, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 07–0017 (2d Cir. Jan. 12, 2009); 1/22/09 Letter from Marc Gottridge, appellees' attorney, to the Court, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 07–0017 (2d Cir. Jan. 12, 2009). Should the Circuit determine that corporations are immune from liability under customary international law, it is likely that this case will be dismissed.

**128.** *Khulumani*, 504 F.3d at 260.

**129.** Although Judge Korman asserted that purported overlap between his dissent in *Khulumani* and Judge Katzmann's concurrence provide "a clear standard, adopted by a majority of the panel, for [the lower court] to

apply," *id.* at 333 (Korman, J., concurring in part and dissenting in part), the convergence of dicta does not create a holding. No statement other than the per curiam opinion is binding on this Court. *See id.* at 286 n. 4 (Hall, J., concurring) ("It is thus left to a future panel of this Court to determine whether international or domestic federal common law is the exclusive source from which to derive the applicable law."); *Mastafa v. Australian Wheat Bd.*, No. 07 Civ. 7955, 2008 WL 4378443, at *4 n. 4 (S.D.N.Y. Sept. 24, 2008) (noting that *Khulumani* left the standard unresolved and declining to adopt a standard due to plaintiffs' failure to make adequate mens rea allegations under either standard to even satisfy the knowledge requirement). Defendants conceded at oral argument that the Circuit has not yet resolved issue. *See* 2/26/09 Hearing Transcript, at 6:19.

**130.** *See* Def. Mem. at 17.

**131.** *See* Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Amended Complaints ("Pl. Mem.") at 22–23.

have only required consultation of the law of nations concerning the *existence of substantive offenses*, the language and logic of *Sosa* require that this Court turn to customary international law to ascertain the *contours of secondary liability* as well.

 The ATCA "enable[s] federal courts to hear claims in a very limited category defined by the law of nations." [132] As Judge Katzmann recognized in his concurrence, an allegation of aiding and abetting a violation of international law or conspiring to violate international law asserts a distinct claim.[133] Thus the judicial act remains one of "recognition," not common law rule-making.[134] There can be no doubt that aiding and abetting claims create liability for a distinct form of conduct. This Court's jurisdiction under the ATCA allows only for the regulation of conduct that is universally forbidden.

Moreover, *Sosa*'s admonition that courts must exercise "an element of judgment about the practical consequences" before recognizing liability under the ATCA necessitates the use of customary international law as the source of law concerning secondary liability.[135] The practical consequences of regulating secondary liability under the ATCA affect conduct around the globe.[136] The United States does not establish such rules alone. As the ATCA is merely a jurisdictional vehicle for the enforcement of universal norms, the contours of secondary liability must stem from international sources. Ideally, the outcome of an ATCA case should not differ from the result that would be reached under analogous jurisdictional provisions in foreign nations such as Belgium, Canada, or Spain.[137] The task of a domestic court is to provide a forum, procedures, and a remedy.[138] Anything more constitutes impermissible judicial policing.[139]

132. *Sosa*, 542 U.S. at 712, 124 S.Ct. 2739.

133. *See Khulumani*, 504 F.3d at 268 (Katzmann, J., concurring).

134. *Sosa*, 542 U.S. at 729, 124 S.Ct. 2739.

135. *Id.* at 732–33, 124 S.Ct. 2739.

136. Given the United States' role as a central hub of commerce and international diplomacy, the effective jurisdiction of United States federal courts far exceeds this nation's citizens and residents. *See, e.g., Kadic*, 70 F.3d at 246–47 (describing personal service on an ATCA defendant in the lobby of a Manhattan hotel and again outside a foreign embassy).

137. *See* Ley Organica del Poder Judicial art. 23(4) (Spain) (providing universal jurisdiction for criminal prosecutions for violations of the law of nations); Debbie Johnston, *Lifting the Veil on Corporate Terrorism: The Use of the Criminal Code Terrorism Framework to Hold Multinational Corporations Accountable for Complicity in Human Rights Violations Abroad*, 66 U. Toronto Fac. L.Rev. 137, 142–43 (2008) (comparing several Canadian laws to the ATCA); Damien Vandermeersch, *Prosecuting International Crimes in Belgium*, 3 J.

Int'l Crim. Just. 400 (2005) (describing extraterritorial jurisdiction in Belgium for violations of *jus cogens* norms of international law). *Cf. Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) ("[I]n all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same.").

138. *See Kadic*, 70 F.3d at 246 ("The law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that are available for international law violations.").

139. *Cf.* Anthony J. Colangelo, *The Legal Limits of Universal Jurisdiction*, 47 Va. J. Int'l L. 149, 150 (2006) ("If national courts prosecute on grounds of universal jurisdiction, they must use the international legal definitions— contained in customary international law—of the universal crimes they adjudicate; otherwise, their exercise of universal jurisdiction contradicts the very international law upon which it purports to rely.").

A secondary concern relates to *Sosa's* requirement that any tort alleged pursuant to the ATCA must be defined with specificity by the law of nations.[140] This rule stems from the Supreme Court's nearly two-centuries old decision in *United States v. Smith*, which noted that if a violation of the law of nations were not defined with "reasonable certainty," it would raise constitutional concerns.[141] The imposition of liability based on a cause of action derived after the conduct in question from an amalgamation of the law of nations and federal common law would raise fundamental fairness concerns.[142]

## B. Aiding and Abetting

There are a multitude of international legal materials from which this Court may draw a standard concerning aiding and abetting liability under the ATCA. I will focus on three sets of sources that the Second Circuit has deemed particularly authoritative: the judgments of the International Military Tribunal at Nuremberg, the decisions of the International Criminal Tribunal for the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR"), and the Rome Statute of the International Criminal Court.[143]

### 1. *Actus Reus*[144]

■ " '[T]he *actus reus* of aiding and abetting in international criminal law requires practical assistance, encouragement, or moral support which has a *substantial effect* on the perpetration of the crime.' "[145] The parties do not dispute this.[146] However, the parties have significantly different views as to the meaning of this language. Therefore, it is necessary to establish precisely what is meant by "a substantial effect on the perpetration of the crime."

■ It is (or should be) undisputed that simply doing business with a state or individual who violates the law of nations is insufficient to create liability under customary international law. International law does not impose liability for declining to boycott a pariah state or to shun a war criminal. Aiding a criminal "is not the same thing as aiding and abetting [his or her] alleged human rights abuses."[147] On the other hand, assistance having a substantial effect "need not constitute an indispensable element, that is, a *conditio sine qua non* for the acts of the princi-

---

140. *See Sosa*, 542 U.S. at 732, 124 S.Ct. 2739 (citing *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 163–80, 5 L.Ed. 57 (1820)).

141. *Smith*, 18 U.S. at 161–63.

142. *Cf. Vietnam Ass'n for Victims of Agent Orange*, 517 F.3d at 123 (requiring application of "a norm [of customary international law] that was universally accepted at the time of the events giving rise to the injuries alleged").

143. *See Khulumani*, 504 F.3d at 270–76 (Katzmann, J., concurring) (establishing the importance of these sources).

144. Although the terms *actus reus* and *mens rea* are ordinarily applied to criminal law, the ATCA provides an alternative civil remedy for violations of customary international law that are traditionally addressed as crimes. Thus *actus reus* and *mens rea* provide a useful framework for analysis of the elements of aiding and abetting under the law of nations.

145. *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring) (quoting *Prosecutor v. Furundzija*, Case No. IT–95–17/1, Trial Chamber Judgment, ¶ 235 (Dec. 10, 1998)). *Accord United States v. Von Weizsacker* (*"The Ministries Case"*), *in* 14 *Trials of War Criminals Before the Nuernberg Military Tribunals*, at 478 (1950) ("The question is whether ... in any substantial manner they aided, abetted, or implemented it.").

146. *See* Def. Mem. at 17; Pl. Mem. at 28.

147. *Mastafa*, 2008 WL 4378443, at *4.

pal."[148] An accessory may be found liable even if the crimes could have been carried out through different means or with the assistance of another.[149]

Substantial effect is best defined by analyzing the difference between two canonical decisions of the International Military Tribunal at Nuremberg. In *The Ministries Case,* the Nuremberg Tribunal found Karl Rasche, a banker who had facilitated large loans to a fund at the personal disposal of Heinrich Himmler—head of the S.S.—not guilty of aiding and abetting crimes against humanity.[150] The Tribunal held that "[l]oans or sale of commodities to be used in an unlawful enterprise may well be condemned from a moral standpoint and reflect no credit on the part of the lender or seller in either case, but the transaction can hardly be said to be a crime."[151] The Tribunal further explained its analogy by describing commodities as "supplies or raw materials" provided to the builder of a house that the seller knows will be used for an unlawful purpose.[152]

On the other hand, in *The Zyklon B Case,* the Tribunal found Bruno Tesch, the owner of a firm that had manufactured and sold the poison gas used in the gas chambers in Nazi concentration camps, guilty of aiding and abetting crimes against humanity.[153] Specifically, the Tribunal heard evidence that Tesch had both supplied Zyklon B and "undertook to train the S.S. men in this new method of killing human beings."[154] However, the Judge Advocate—the neutral legal advisor to the court in a British military tribunal[155]—summed up the necessary act to prove aiding and abetting as merely supplying the gas used to execute allied nationals.[156]

 The distinction between these two cases is the quality of the assistance provided to the primary violator. Money is a fungible resource, as are building materials. However, poison gas is a killing agent, the means by which a violation of the law of nations was committed. The provision of goods specifically designed to kill, to inflict pain, or to cause other injuries resulting from violations of customary international law bear a closer causal connection to the principal crime than the sale of raw materials or the provision of loans.[157] Training in a precise criminal use only further supports the importance of

---

148. *Furundzija* ¶ 209. *Accord Mastafa,* 2008 WL 4378443, at *3 (noting that a requirement of but-for causality "would significantly undermine aiding and abetting liability in the federal courts").

149. *See Prosecutor v. Tadic,* Case No. IT–94–1–T, Trial Chamber Judgment *("Tadic I")* ¶ 688 (May 7, 1997); *Blagovjevic v. Jokic,* Case No. IT–02–60–A, Appeal Judgement ¶¶ 127, 134 (May 9, 2007).

150. *See The Ministries Case* at 621–22.

151. *Id.* at 621.

152. *Id.*

153. *See Trial of Bruno Tesch and Two Others ("The Zyklon B Case"), in* 1 *Law Reports of Trials of War Criminals* 93–103 (1947).

154. *Id.* at 95.

155. *See* British Royal Warrant of June 14, 1945, § 5, *reprinted in* Telford Taylor, Final Report to the Secretary of the Army on the Nuremberg War Crimes Trials Under Control Council Law No. 10, at 255 (1949).

156. *See The Zyklon B Case* at 101.

157. Although such goods may have legitimate uses, that issue is addressed by the *mens rea* element. *Compare The Zyklon B Case* at 142 (convicting an individual who provided poison gas to the S.S. knowing its intended use), *with United States v. Krauch ("The I.G. Farben Case"), in* 8 *Trials of War Criminals Before the Nuernberg Military Tribunals,* at 1168 (1952) (acquitting employees of I.G. Farben who sold poison gas to the S.S. believing that it would be used for delousing).

this link. Therefore, in the context of commercial services, provision of the means by which a violation of the law is carried out is sufficient to meet the *actus reus* requirement of aiding and abetting liability under customary international law.[158]

## 2. *Mens Rea*

Even assuming that this Court would adopt secondary liability standards from customary international law, the parties still dispute what level of *mens rea* is necessary under the law of nations to prove aiding and abetting liability. Defendants argue that liability requires proof that an accomplice *intended* to further the primary violation of the law of nations.[159] Plaintiffs claim that even under customary international law, mere *knowledge* that the

accomplice's acts will provide substantial assistance to the primary violation is sufficient.[160]

The vast majority of international legal materials clearly prescribe knowledge as the *mens rea* requirement for aiding and abetting. The ICTY set forth this standard most succinctly, requiring "knowledge that [the aider or abettor's] actions will assist the perpetrator in the commission of the crime."[161] Despite the clear prevalence of the knowledge standard, this Court must adhere to the restrictive approach to *mens rea* laid out in Judge Katzmann's *Khulumani* concurrence; in the presence of a substantial conflict in authority, this Court must set the requirement at a level where all major sources of customary international law would "authorize the

**158.** The Rome Statute further supports this distinction. *See* Rome Statute art. 25(c) (noting that "providing the means for [a crime's] commission" is one example of aiding, abetting, or otherwise assisting a violation of the law of nations).

**159.** *See* Def. Mem. at 20–23.

**160.** *See* Pl. Mem. at 23–27.

**161.** *Furundzija* ¶ 245. *Accord, e.g., Prosecutor v. Vasiljevic*, Case No. IT–98–32–A, Appeals Judgment ¶ 102 (Feb. 25, 2004) ("In the case of aiding and abetting, the requisite mental element is knowledge that the acts performed by the aider and abettor assist the commission of the specific crime by the principal."); *Prosecutor v. Akayesu*, No. ICTR–96–4–T ¶ 545 (Dec. 10, 1998) ("[A]n accused is liable as an accomplice to genocide if he knowingly aided or abetted or instigated one or more persons in the commission of genocide, while knowing that such a person or persons were committing genocide, even though the accused himself did not have the specific intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such."); *Tadic I* ¶¶ 674, 692 (May 7, 1997) (requiring knowing participation or "a conscious decision to participate" via the provision of sub-

stantial assistance); *United States v. Flick, in* 6 *Trials of War Criminals Before the Nuernberg Military Tribunals* 1217 (1952) ("One who knowingly by his influence and money contributes to the support [of a violation of the law of nations] thereof must, under settled legal principles, be deemed to be, if not a principal, certainly an accessory to such crimes."); *United States v. Ohlendorf in* 4 *Trials of War Criminals Before the Nuernberg Military Tribunals* 569 (1949) (convicting an individual who had provided a list of communists because "he was aware that the people listed would be executed when found"); *The Zyklon B Case* at 101 (describing liability as requiring "that the accused knew that the gas was to be used for the purpose of killing human beings"); *Draft Code of Crimes Against the Peace and Security of Mankind*, [1996] 2 Y.B. Int'l L. Comm'n., ch. 2, arts. 2(3)(d), 17, 18, 20, U.N. Doc. A/CN.4/SER.A/1996/Add.1 (Part. 2). *See generally* Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts*, 6 Nw. U.J. Int'l Hum. Rts. 304, 314 (2008) ("[T]he majority of the post-World War II case law, case law of the ICTY and the ICTR, the [International Law Commission] Draft Code, and group crimes under article 25(3)(d) of the [Rome] Statute, requires that those who aid and abet merely have *knowledge* that they are assisting criminal activity.").

imposition of such liability." [162] "The critical question is whether there is a discernable core definition that commands the same level of consensus as the 18th-century crimes identified by the Supreme Court in *Sosa*."[163] This lowest-common-denominator approach also prevents the imposition of liability in American courts that might not be ordered in an alternative forum.

The acquittal in *The Ministries Case* does not disturb the universal knowledge requirement found in international jurisprudence. The Military Tribunal found that Rasche had knowledge "as to the purpose for which the loan [was] sought, and how it [was] to be used." [164] However, the acquittal did not rest on the absence of criminal intent. The Tribunal never discussed whether facilitation of a loan with express intent to further the crimes of the S.S. would create criminal liability, indicating that the *mens rea* was not pivotal. Rather, the Tribunal focused on the nature of the act, stating, "[W]e are not prepared to state 732. that such loans constitute a violation of that law." [165] In other words, the Tribunal acquitted Rasche for not having met the *actus reus* requirement of aiding and abetting. Moreover, with regard to different defendants in the same case, the Tribunal stated, "The question is whether they *knew* of the program and whether in any substantial manner they aided, abetted, or implemented it." [166] Thus *The Ministries Case* does not deviate from the standard *mens rea* requirement found in customary international law.

Nor did the *Akayesu* decision of the ICTR reach a contrary result. *Akayesu* noted that because of the nature of the crime of genocide, the act of aiding and abetting one who commits genocide could itself be considered an act of genocide, rather than an instance of secondary liability.[167] Because genocide is a specific intent crime,[168] when the act of aiding or abetting genocide constitutes a primary violation, specific intent is required.[169] Nevertheless, *Akayesu* expressly recognized the general rule that secondary liability for aiding and abetting under customary international law requires only knowledge of the crimes of the primary actor.[170]

The Rome Statute of the International Criminal Court presents the most difficult question concerning the universality of the knowledge standard for aiding and abetting under customary international law. Article 25(c) of the Rome Statute creates

---

**162.** *Khulumani,* 504 F.3d at 277 (Katzmann, J., concurring).

**163.** *Id.* at 276 n. 12 (Katzmann, J., concurring) (citing *Sosa,* 542 U.S. at 732, 124 S.Ct. 2739).

**164.** *The Ministries Case* at 622.

**165.** *Id. Accord id.* ("The real question is, is it a crime to make a loan, knowing or having good reason to believe that the borrower will use the funds in financing enterprises which are employed in using labor in violation of either national or international law?").

**166.** *Id.* at 478 (emphasis added).

**167.** *See Akayesu* ¶ 485.

**168.** *See id.* ¶ 498.

**169.** *See id.* ¶ 485.

**170.** *See id.* ¶ 545 ("[A]n accused is liable as an accomplice to genocide if he knowingly aided or abetted or instigated one or more persons in the commission of genocide, while knowing that such a person or persons were committing genocide, even though the accused himself did not have the specific intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such."). *See also id.* ¶ 489 (noting that "criminal intent is a moral element required for any crime" but holding that even "negligence so serious as to be tantamount to acquiescence" is sufficient to meet that standard).

criminal liability for an individual who *"[f]or the purpose of* facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission." [171] On this basis, Judge Katzmann stated that the only conduct universally condemned with the degree of certainty required by *Sosa* is the provision of substantial assistance by an aider and abettor who shares the primary violator's intent.[172]

However, Judge Katzmann recognized that the Rome Statute "has yet to be construed by the International Criminal Court" and that "its precise contours and the extent to which it may differ from customary international law thus remain somewhat uncertain." [173] The Rome Statute was not intended to eliminate rights existing under the law of nations; [174]

therefore in most cases the Statute codifies rather than modifies previously existing and clearly established customary international law.[175] Nevertheless, where the Rome Statute *explicitly* deviates from the law of nations, it is fair to assume that those rules are unique to the ICC, rather than a rejection of customary international law.[176] There is no explicit deviation in the Rome Statute with regard to aiding and abetting liability. Article 25(c) can reasonably be interpreted to conform to pre-Rome Statute customary international law.

"It remains unclear whether 'purpose' [in Article 25(c)] means sole purpose, primary purpose, or simply purpose as inferred from knowledge of likely consequences." [177] As one prominent scholar has explained, a secondary purpose can be inferred from knowledge of the likely consequences of an act.[178] This logic is partic-

171. Rome Statute art. 25(c) (emphasis added).

172. *See Khulumani,* 504 F.3d at 277 (Katzmann, J., concurring). *See also id.* at 333 (Korman, J., concurring in part and dissenting in part) (stating that if aiding and abetting were criminalized under customary international law, this would be the standard).

173. *Id.* at 275–76 (Katzmann, J., concurring).

174. *See* Rome Statute art. 10. *See also* Janet Halley, *Rape at Rome: Feminist Interventions in the Criminalization of Sex–Related Violence in Positive International Criminal Law,* 30 Mich. J. Int'l L. 1, 41 (2008) ("The legitimacy of the ICC also rested in part on the representation of the Rome Statute as merely a codification of existing humanitarian law.").

175. *See generally Khulumani,* 504 F.3d at 276 (Katzmann, J., concurring) ("[The Rome Statute] may therefore be taken 'by and large . . . as constituting an authoritative expression of the legal views of a great number of States.'" (quoting *Furundzija,* ¶ 277)); *Furundzija* ¶ 227 (noting that the Rome Statute is an expression of customary international law with some specific deviations).

176. A derogation in the Rome Statute from customary international law "is considered a *lex specialis* in relation to the general principle" rather than a modification of customary international law. Paola Anna Pillitu, *European "Sanctions" Against Zimbabwe's Head of State and Foreign Minister: A Blow to Personal Immunities of Senior State Officials,* 1 J. Int'l Crim. Just. 453, 457 n.18 (2003). *Accord* Beth Van Schaack, *Crimen Sine Lege: Judicial Lawmaking at the Intersection of Law and Morals,* 97 Geo. L.J. 119, 177 n.298 (2008) ("[T]he relatively static Statute may not reflect existing CIL and should not 'chill' the continuing process of CIL development."); Mohamed M. El Zeidy, *Critical Thoughts on Article 59(2) of the ICC Statute,* 4 J. Int'l Crim. Just. 448, 454 (2006) (noting that detailed arrest procedures in the Rome Statute are not drawn from customary international law and are therefore specific to the ICC).

177. Chimene I. Keitner, *Conceptualizing Complicity in Alien Tort Cases,* 60 Hastings L.J. 61, 88 (2008) (citing Cassel, *supra,* at 312).

178. *See* Cassel, *supra,* at 312.

ularly prominent in the case of a person or corporation who provides the means by which a crime in violation of the law of nations is carried out, as the primary purpose—profit—is furthered by the success of an ongoing crime. Thus it may reasonably be inferred that an arms dealer providing weapons to perpetrators of a genocide tacitly supports the genocide, as it creates demand for that increases profit.[179]

Moreover, Article 25(c) does not exist in isolation.[180] Article 30—entitled "Mental State"—provides that:

> A person has intent where: (a) In relation to conduct, that person means to engage in the conduct; [and] (b) In relation to a consequence, that person means to cause that consequence *or is aware* that it will occur in the ordinary course of events.[181]

Thus even assuming that *"[f]or the purpose of* facilitating commission of such a crime" in Article 25(c) carries an intent requirement, within the context of the Rome Statute "intent" does not require that an aider or abettor share the primary actor's purpose. The *actions* must be taken intentionally: there is no liability for the provision of assistance under duress.[182]

But the aider or abettor may be held liable if he or she *is aware* that the assistance provided will substantially assist the commission of crimes in violation of the law of nations. The portion of the *mens rea* requirement related to the outcome—rather than the act—is in fact identical to the Rome Statute's definition of knowledge: "awareness that a circumstance exists or a consequence will occur in the ordinary course of events."[183] Under the Rome Statute—and under customary international law—there is no difference between amorality and immorality. One who substantially assists a violator of the law of nations is equally liable if he or she desires the crime to occur or if he or she knows it will occur and simply does not care.

■ Therefore, there are no applicable international legal materials requiring a finding of specific intent before imposing liability for aiding and abetting a violation of customary international law. As a result, I conclude that customary international law requires that an aider and abettor know that its actions will substantially assist the perpetrator in the commission of a crime or tort in violation of the law of nations.[184]

---

179. Such secondary purpose can be implied in the seminal *Zyklon B Case,* where the prosecutors "did not attempt to prove that the accused acted with the intention of assisting the killing of the internees." *Furundzija,* ¶ 238. "The charge as accepted by the court was that they knew what the buyer in fact intended to do with the product they were supplying." *Id. Cf. The Ministries Case* at 622 (finding mere knowledge and not referencing secondary purpose where the acquittal turned on the absence of a sufficiently criminal act).

180. This Court must look to the text of the treaty as a whole in order to interpret its meaning. *See Air France v. Saks,* 470 U.S. 392, 396–97, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) ("The analysis [of a treaty] must begin, however, with the text of the treaty and the context in which the written words are used.").

181. Rome Statute art. 30(2) (emphasis added).

182. *Cf. Negusie v. Holder,* —— U.S. ——, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) (remanding the case to the Board of Immigration Appeals to determine whether coercion or distress is relevant to the "persecutor bar" to asylum status under the Immigration and Nationality Act); *id.* at 1174 (Stevens, J., concurring) ("I think it plain that the persecutor bar does not disqualify from asylum or withholding of removal an alien whose conduct was coerced or otherwise the product of duress.").

183. Rome Statute art. 30(3).

184. Notably, a corporation is imputed to share the *mens rea* of employees acting within the scope of their authority. *See United States v. Twentieth Century Fox Film Corp.,* 882 F.2d

## C. Conspiracy

■ The Second Circuit's decision in *Khulumani* did not provide guidance concerning conspiratorial liability in ATCA cases. I again look to customary international law as the source of relevant authority. In *Prosecutor v. Tadic*, the ICTY recognized Joint Criminal Enterprise as a crime derived from customary international law and comparable to conspiracy.[185] However, the ICC has repeatedly declined to apply a broad notion of conspiratorial liability under customary international law.[186] Jurists from the civil law tradition have long resisted the application of conspiracy to crimes under the law of nations, as conspiracy is an Anglo–American legal concept.[187] Importantly, the Supreme Court recently stated in *Hamdan v. Rumsfeld* that the law of war provides liability only for "conspiracy to commit genocide and common plan to wage aggressive war."[188] While *Hamdan* did not address the ATCA, this Court must nevertheless apply the Supreme Court's assessment of the law of nations. *Sosa* requires that this Court recognize only forms of liability that have been universally accept-

ed by the community of developed nations. Conspiracy does not meet this standard. Therefore, this Court declines to recognize conspiracy as a distinct tort to be applied pursuant to ATCA jurisdiction.

## VII. SPECIFIC AIDING AND ABETTING CLAIMS

Only plaintiffs' aiding and abetting claims survive the foregoing analysis of direct and secondary liability. I now turn to an analysis of each claim. I analyze each Complaint separately, as allegations of particular actions vary a great deal between the two Complaints.[189]

### A. The *Ntsebeza* Complaint

The *Ntsebeza* Complaint does not merely allege that defendants engaged in commerce with a pariah state. Rather, the *Ntsebeza* plaintiffs allege that "many corporations, including Defendants, provided essential assistance to the apartheid state . . . knowing that such assistance would lead directly to the violation of the human rights of black South Africans."[190]

---

656, 660 (2d Cir.1989). *See also United States v. Ionia Mgmt., S.A.,* 555 F.3d 303, 309–10 (2d Cir.2009) (applying *Twentieth Century Fox* and rejecting a limitation to "managerial" employees).

185. *See Prosecutor v. Tadic,* Case No. IT–94–1–A, Appeals Chamber Judgment ("*Tadic II*") ¶¶ 227–228 (July 15, 1999).

186. *See, e.g., Prosecutor v. Thomas Lubanga Dyilo,* Situation in the Democratic Rep. of Congo, ICC–01/04–01/06–803–tEN, ICC Pre-Trial Chamber Decision on the Confirmation of Charges ¶¶ 326–338 (Jan. 29, 2001).

187. *See, e.g.,* Geert–Jan Alexander Knoops, *The Proliferation of the Law of International Criminal Tribunals Within Terrorism and "Unlawful" Combatancy Trials After Hamdan v. Rumsfeld,* 30 Ford. Int'l L.J. 599, 613 (2007) (describing opposition from civil-law jurists dating back to the Nuremberg Tribunals).

188. *See* 548 U.S. 557, 610–12, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (plurality op.), *superseded by statute on other grounds as stated in Rasul v. Myers,* 512 F.3d 644 (D.C.Cir.2008). *See also Presbyterian Church of Sudan v. Talisman Energy, Inc.* ("*Talisman III*"), 453 F.Supp.2d 633, 664–65 (S.D.N.Y.2006), *appeal pending* No. 07–0016 (2d Cir. argued Jan. 12, 2009) (noting the limits of conspiratorial liability under customary international law).

189. *See In re Terrorist Attacks on September 11, 2001,* 349 F.Supp.2d 765, 780 n. 2 (S.D.N.Y.2005) (noting the submission of separate motions to dismiss separate actions in a multi-district litigation unless those actions were "materially identical").

190. *Ntsebeza* Complaint ¶ 53.

### 1. The Automotive Defendants

■ Although the allegations against each defendant must be assessed individually, the *Ntsebeza* plaintiffs have made sufficiently similar allegations against the three automotive companies that they may be discussed together. In sum, plaintiffs have adequately pled allegations against Daimler, Ford, and GM to sustain claims for aiding and abetting apartheid, torture, extrajudicial killing, and CIDT.

First, plaintiffs allege that Daimler, Ford, and GM security personnel were intimately involved in the torture and CIDT of several plaintiffs. Specifically, plaintiffs allege that management provided information about anti-apartheid activists to the South African Security Forces, facilitated arrests, provided information to be used by interrogators, and even participated in interrogations.[191] The provision of names of anti-apartheid activists to the South African Government satisfies the *actus reus* requirement of torture and CIDT, as it allowed the Government to target those who opposed its rule. Moreover, the automotive companies undoubtedly knew what would happen to those whose names they provided,[192] and the direct participation of company personnel in interrogation—if not torture—only further supports the presence of sufficient *mens rea*.

Next, plaintiffs allege that Daimler, Ford, and GM aided and abetted extrajudicial killing through the production and sale

of specialized military equipment. Plaintiffs allege that the automotive defendants sold heavy trucks, armored personnel carriers, and other specialized vehicles to the South African Defense Forces and the Special Branch, the South African police unit charged with investigating anti-apartheid groups.[193] These vehicles were the means by which security forces carried out attacks on protesting civilians and other antiapartheid activists;[194] thus by providing such vehicles to the South African Government, the automotive companies substantially assisted extrajudicial killing. Plaintiffs have also alleged that defendants were fully aware of the crucial role that their vehicles played in the violent suppression of anti-apartheid activities.[195] Specifically, employees at each company allegedly protested the use of products they built to suppress apartheid.[196] The companies allegedly acknowledged this protest but responded by stating that "it was a duty of all South Africans to support the security forces"[197] or that all protestors "would be assumed to be members of the African National Congress"[198] or by retaliating against protestors.[199] Through these allegations, plaintiffs have adequately pled that defendants knew that the sale of military vehicles would substantially assist the South African Government in carrying out extrajudicial killings.

In combination, the violations of customary international law that the automotive

---

191. *See id.* ¶¶ 56–58, 61 (Daimler); *id.* ¶¶ 89–91(GM); *id.* ¶¶ 110, 119–122 (Ford).

192. *Cf. Ohlendorf*, at 569 (finding defendant guilty of aiding and abetting Nazi war crimes by turning over a list of individuals who he knew "would be executed when found").

193. *See Ntsebeza* Complaint ¶¶ 64–65 (Daimler); *id.* ¶¶ 85–86(GM); *id.* ¶ 104 (Ford).

194. *See id.* ¶¶ 68–76 (Daimler); *id.* ¶ 85–87(GM); *id.* ¶ 104 (Ford).

195. *See id.* ¶ 67 (Daimler); *id.* ¶ 88(GM); *id.* ¶ 104 (Ford).

196. *See id.* ¶ 66 (Daimler); *id.* ¶ 87(GM); *id.* ¶ 105 (Ford).

197. *Id.* ¶ 66 (Daimler).

198. *Id.* ¶ 87(GM).

199. *See id.* ¶ 105 (Ford).

companies allegedly aided and abetted constitute apartheid. As described above, the crime of apartheid under customary international law is the commission of inhumane acts in the context of systemic racial oppression. Plaintiffs have undoubtedly pled that the inhumane acts that the automotive companies allegedly aided and abetted occurred because of and in the context of apartheid.[200] It is beyond cavil that the automotive companies were aware of the crimes of apartheid. Therefore, the *Ntsebeza* Complaint adequately pleads that the automotive defendants aided and abetted apartheid, torture, extrajudicial killing, and CIDT.

## 2. International Business Machines Corporation

▬ The *Ntsebeza* plaintiffs have pled that IBM aided and abetted the South African Government's denationalization of black South Africans through the provision of computers, software, training, and technical support. Not every violation of the law of nations involves killing, and therefore not every commercial entity that aids and abets violations of customary international law need provide a gun, a tank, or poison gas. Specifically, IBM allegedly sold the South African Government—along with the governments of the bantustans Bophuthatswana, Gazankulu, KwaZulu, Lebowa, Transkei, and Venda—computers used to register individuals, strip them of their South African citizenship, and segregate them in particular areas of South Africa.[201] More importantly, IBM employees also assisted in developing computer software and computer support specifically designed to produce identity documents and effectuate denationalization.[202] Such customized computerized systems were in-

dispensable to the organization and implementation of a system of geographic segregation and racial discrimination in a nation of millions. Moreover, the records necessary to deliberately denationalize a large proportion of black South Africans were generated using equipment allegedly provided by IBM. Therefore, the *Ntsebeza* plaintiffs have adequately alleged the *actus reus* for aiding and abetting both arbitrary denationalization and the broader crime of apartheid.

Plaintiffs have alleged that IBM knew how its products were being used by the South African Government and that IBM engaged in subterfuge to avoid public recriminations and an American embargo.[203] While the direct allegations of knowledge are somewhat thin, given that IBM provided the programming expertise as well as the hardware, there is a plausible inference that the company understood the nature of the projects it assisted. Therefore, the *Ntsebeza* plaintiffs have adequately alleged the *mens rea* for aiding and abetting both arbitrary denationalization and apartheid.

▬ However, the *Ntsebeza* plaintiffs have not pled allegations sufficient to sustain a claim of aiding and abetting CIDT against IBM. Although theoretically the identity documents created through the use of IBM computers and software helped target individuals found outside of permitted geographic areas for CIDT, computers were not an essential element of CIDT or the means by which it was carried out. Thus the *Ntsebeza* plaintiffs have not met the *actus reus* requirement for aiding and abetting CIDT. Nor does CIDT inevitably flow from geographic segregation decrees enforced through the use of identity cards

---

200. *See id.* ¶¶ 41–54.

201. *See id* ¶¶ 133–135, 137.

202. *See id.* ¶¶ 134–135, 137.

203. *See id.* ¶¶ 139–140.

produced using IBM computers. Therefore, the *Ntsebeza* plaintiffs also fail to meet the *mens rea* requirement, even allowing all reasonable inferences in their favor. The *Ntsebeza* plaintiffs' claim that IBM aided and abetted CIDT is therefore dismissed.

### 3. Barclays Bank PLC

██ The *Ntsebeza* plaintiffs' claims against Barclays rest on the employment practices of the bank.[204] Although the systemic denial of job opportunities on the basis of race is abhorrent, Barclays' employment practices do not meet the *actus reus* requirement of aiding and abetting apartheid. Barclays' hiring patterns were aligned with geographic segregation already established by the South African Government. The employment practices were more akin to acquiescence to—rather than the provision of essential support for—apartheid. Nor do the claims against Barclays relate to mistreatment of individuals detained by the South African Government. Therefore, the *Ntsebeza* plaintiffs' claims that Barclays aided and abetted apartheid and CIDT are dismissed.

### B. The *Khulumani* Complaint

The *Khulumani* plaintiffs similarly do not assert claims against defendants merely for doing business with the South African Government. Rather plaintiffs claim that defendants supplied military material, computer expertise and financing that had a "substantial effect" on the commission of crimes in violation of the law of nations.[205]

### 1. Automotive Defendants

The *Khulumani* plaintiffs allege that the automotive defendants supplied vehicles, parts, and other equipment "used to patrol townships to target political opponents, repress the African population, quell public displays of dissent, and brutalize and kill many citizens as described herein."[206] As discussed below, these allegations are sufficient to maintain claims for aiding and abetting extrajudicial killing and apartheid against Daimler but not against GM or Ford; they do not meet the *actus reus* requirement for aiding and abetting against any of the automotive defendants for the various other crimes alleged.

██ Specifically the *Khulumani* plaintiffs allege that Daimler sold "Unimog" military vehicles to the South African Government, as well as components of the "Casspir" and "Buffer" vehicles that were used by internal security forces.[207] These vehicles were allegedly used to patrol the townships and their military fittings were used to carry out extrajudicial killings.[208] As the vehicles were the means by which the South African Defense Forces killed black South Africans as part of the maintenance of a system of state-sponsored apartheid, the allegations satisfy the *actus reus* requirement of aiding and abetting both extrajudicial killing and apartheid.

One Daimler employee allegedly reported to a shareholder meeting that Daimler provided parts for a vehicle used "for the occupation and control of black urban settlements."[209] Moreover, Daimler allegedly acknowledged the service and repair relationship between its subsidiary Mercedes Benz Exchange Unit Services and

---

204. *See id.* ¶¶ 143–145.

205. *Khulumani* Complaint ¶¶ 1–2.

206. *Id.* ¶¶ 254, 256.

207. *See id.* ¶¶ 256–263.

208. *See id.* ¶¶ 24, 264.

209. *Id.* ¶ 281.

the South African military but stated that it "was strictly confidential."[210] Moreover, the *Khulumani* plaintiffs allege that Daimler knew the vehicles and components it exported fell within the United Nations Security Council's ban on the export of military equipment to South Africa.[211] Finally, the *Khulumani* plaintiffs broadly allege that Daimler knew that the equipment it provided would be used to carry out violations of the law of nations.[212] In the context of the specific allegations made against Daimler, this broad allegation plausibly satisfies the *mens rea* requirement of aiding and abetting extrajudicial killing and apartheid.

■ On the other hand, Daimler did not "acquire a stake in the criminal venture that was the apartheid regime"[213] through the sale of military equipment to the South African Government. The sale of vehicles does not satisfy the *actus reus* requirement of aiding and abetting torture, prolonged unlawful detention, and CIDT. Therefore, these claims are dismissed.

■ Moreover, the *Khulumani* plaintiffs' allegations concerning Ford and GM are simply too similar to ordinary vehicle sales to meet the *actus reus* requirement

of aiding and abetting violations of customary international law. For example, Ford allegedly sold "passenger vehicles" and "F series U.S.-origin trucks to the police."[214] Similarly, GM allegedly sold "cars and trucks to police and military agencies in South Africa" and after the imposition of export restrictions continued to sell "commercial vehicles—primarily small trucks—to the security forces."[215] The sale of cars and trucks without military customization or similar features that link them to an illegal use does not meet the *actus reus* requirement of aiding and abetting a violation of the law of nations.[216] While GM or Ford may have violated American export controls, the allegations do not amount to a tort cognizable under the ATCA. The *Khulumani* plaintiffs' claims that Ford and GM aided and abetted extrajudicial killing, torture, prolonged unlawful detention, CIDT, and apartheid are dismissed. However, given the relative similarity between the *Khulumani* plaintiffs' conclusory extrajudicial killing and apartheid claims and the *Ntsebeza* plaintiffs' specific allegations, the *Khulumani* plaintiffs will be permitted to file an amended complaint conforming their allegations to those in the *Ntsebeza* Complaint with regard to the claims against GM and Ford.[217]

210. *Id.* ¶¶ 282–283.

211. *See id.* ¶ 258.

212. *See id.* ¶ 289.

213. *Id.* ¶ 300.

214. *Id.* ¶¶ 267–268.

215. *Id.* ¶¶ 276–277.

216. Although the *Khulumani* plaintiffs do offer omnibus allegations that the three automotive defendants "supplied [vehicles] to the South African security forces ... designed to enable the security forces to track and attack civilians, patrol communities, and terrorize the Black population," this statement treats the three defendants as a unit. *Id.* ¶ 298.

Moreover, the allegation that the three automotive defendants uniformly supplied "armored tanks equipped with machine gun mounts and other types of military vehicles," *id.,* and vehicles "pre-equipped with armor and military fixtures" is contradicted by the specific allegations concerning GM and Ford. *See, e.g., id.* ¶¶ 267–268 (describing Ford's sales as "Fseries trucks" and "passenger vehicles"). Because this Court must assess the allegations against each defendant separately, I do not consider these uniform assertions with regard to claims against each of the individual defendants.

217. If the allegations in the amended *Khulumani* Complaint are similar to those made in the *Ntsebeza* Complaint, the outcome of any motion to dismiss will be the same. Although

### 2. The Technology Defendants

■ The *Khulumani* plaintiffs next allege that defendants IBM and Fujitsu supplied computer equipment "designed to track and monitor civilians with the purpose of enforcing the racist, oppressive laws of apartheid."[218] Specifically, IBM allegedly supplied computers to the South African Department of the Interior with a "specially-designed, computerized population registry," including "the software and database design as well as the hardware to run the system."[219] This system "was used to track racial classification and movement for security purposes" and was essential in "implementing and enforcing the racial pass laws and other structural underpinnings of the apartheid system."[220] Similarly, the *Khulumani* plaintiffs allege that Fujitsu—through a subsidiary formerly known as International Computers Limited—"developed an automated database of information on South Africa's Black population" designed specifically "to facilitate the government's implementation of the racial pass system."[221] These allegations describe provision of the means by which the South African Government carried out both racial segregation and discrimination; thus they meet the *actus reus* requirement of aiding and abetting apartheid.

Moreover, the alleged specificity of the systems designed by both IBM and Fujitsu provides a strong inference that the technology companies knew that use of the computer hardware and software they supplied would inexorably support the com-

mission of the crimes of apartheid. Moreover, plaintiffs specifically allege that IBM and Fujitsu worked through a front corporation to mask their business with the South African Government.[222] Specifically, IBM allegedly conceded that its equipment and services might be used for repressive purposes but stated, "It's not really our policy to tell our customers how to conduct themselves."[223] That level of willful blindness in the face of crimes in violation of the law of nations cannot defeat an otherwise clear showing of knowledge that the assistance IBM provided would directly and substantially support apartheid. Therefore, plaintiffs have adequately pled that IBM and Fujitsu aided and abetted the commission of apartheid by the Government of South Africa.

■ However, not every computer system provided to the Government of South Africa or South African defense contractors is sufficiently tied to violations of customary international law. Although IBM allegedly sold computer systems to numerous government agencies, the mere sale of computers to the Department of Prisons—despite the widely held knowledge that political prisoners were routinely held and tortured without trial[224]—does not constitute substantial assistance to that torture. Similarly, IBM allegedly rented computers to Leyland–South Africa and African Explosives and Chemical Industries Ltd., two armaments manufacturers crucial to the South African Defense Forces.[225] However, the sale of equipment used to enhance

---

I recognize defendants' need to preserve their objection, this need not be done through extensive briefing.

218. *Id.* ¶ 248.

219. *Id.* ¶¶ 233.

220. *Id.* ¶¶ 234–235.

221. *Id.* ¶¶ 215–216.

222. *See id.* ¶ 228 (Fujitsu); *id.* ¶ 241(IBM).

223. *Id.* ¶ 242.

224. *See id.* ¶ 237.

225. *See id.* ¶ 240.

the logistics capabilities of an arms manufacturer is not the same thing as selling arms used to carry out extrajudicial killing; it is merely doing business with a bad actor. Although more closely related to the violations of the law of nations at issue, even the sale of computers to the South African Defense Forces does not constitute aiding and abetting any and all violations of customary international law that the military committed, as computers are not the means by which those violations were carried out. Most broadly, "sustaining the apartheid regime"[226] does not render the technology defendants liable for aiding and abetting all violations of the law of nations committed in apartheid-era South Africa. Therefore, the *Khulumani* plaintiffs' claims that the technology defendants aided and abetted extrajudicial killing, torture, prolonged unlawful detention, and CIDT are dismissed.

### 3. Banking Defendants

 The *Khulumani* plaintiffs' claims against Barclays and UBS stem primarily from the provision of loans by the two banks and the purchase of South African defense forces bonds.[227] As described above, supplying a violator of the law of nations with funds—even funds that could not have been obtained but for those loans—is not sufficiently connected

to the primary violation to fulfill the *actus reus* requirement of aiding and abetting a violation of the law of nations. The *Khulumani* plaintiffs additionally assert that Barclays aided and abetted apartheid by permitting one of its directors to serve on an advisory board to the South African Defense Forces.[228] However, not every action taken by a corporate director is within the scope of his or her employment.[229] The *Khulumani* plaintiffs have not alleged that the Barclay's director served on the board as a Barclays representative. Moreover, even assuming that the Barclays director served in an official capacity, service on an advisory board concerning the use of "business methods" "to assist in the implementation" of apartheid[230] is simply too attenuated from the commission of apartheid to fulfill the *actus reus* requirement of aiding and abetting. Therefore, the *Khulumani* plaintiffs' claims that Barclays and UBS aided and abetted apartheid, extrajudicial killing, torture, prolonged unlawful detention, and CIDT are dismissed.

### 4. Rheinmetall Group A.G.[231]

The *Khulumani* plaintiffs allege that Rheinmetall Group "exported significant quantities of armaments and related equipment and expertise to South Africa" knowing that this war material would be used to

---

226. *Id.* ¶ 230.

227. *See id.* ¶¶ 149, 152, 156, 158–167, 169, 171.

228. *See id.* ¶¶ 153–155.

229. *Cf., e.g., Shapo v. O'Shaughnessy*, 246 F.Supp.2d 935, 962 (N.D.Ill.2002) (holding that a corporation is liable for acts taken by a director within the scope of his or her authority); *Texam Oil Corp. v. Poynor*, 436 S.W.2d 129, 130 (Tex.1968) (holding that a corporation is liable for libelous statements of a director when those statements were made in the scope of the director's duties).

230. *Khulumani* Complaint ¶¶ 153–154.

231. Although Rheinmetall did not join in defendants' joint motion to dismiss, I will briefly discuss the viability of the *Khulumani* plaintiffs' claims against Rheinmetall for the sake of completeness and efficiency. As neither plaintiffs nor defendants addressed claims in their papers, this prejudices neither Rheinmetall nor the *Khulumani* plaintiffs. Moreover, Rheinmetall retains the right to move to dismiss should its jurisdictional motion be denied.

commit extrajudicial killing.[232] Plaintiffs allege that Rheinmetall thereby provided the direct means by which the South African Government carried out extrajudicial killings in the context of and in order to sustain state-based racial segregation.[233] These allegations would satisfy the *actus reus* requirement of aiding and abetting extrajudicial killing and apartheid. The *Khulumani* plaintiffs also allege that Rheinmetall used fraudulent export declarations, fictitious foreign firms, and false end-user declarations to transport armaments to South Africa.[234] Plaintiffs further allege that the head of Oerlikon–Bührle—Dieter Bührle—complained to the Swiss Government concerning the business implications of an arms embargo against South Africa,[235] and that Oerlikon–Bührle used false end-user certificates to circumvent export controls.[236] These allegations—together with conclusory allegations that Rehinmetall knew that weapons it produced would inevitably be used to carry out atrocities [237]—would be sufficient to meet the *mens rea* requirement of aiding and abetting extrajudicial killing and apartheid.

However, allegations that Rheinmetall sold armaments to the South African Defense Forces do not appear to be sufficiently linked to torture, prolonged unlawful detention, and CIDT to meet the *actus reus* requirement of aiding and abetting those offenses, and those claims are likely to be dismissed.[238]

## VIII. ALTER–EGO AND AGENCY

Five of the six remaining defendants—Daimler, GM, Ford, IBM, and Fujitsu—assert that they cannot be held liable for the actions alleged in the two Complaints because those acts are properly attributed to subsidiaries, indirect-subsidiaries, or affiliates.[239] Plaintiffs claim that liability is properly assessed against the parent companies through theories of alter ego or agency.[240] The quality of allegations concerning these theories varies among defendants and between the two Complaints.

### A. Applicable Law

Although the ATCA requires this Court to apply customary international law whenever possible, it is necessary to rely on federal common law in limited instances in order to fill gaps.[241] This results in part from the historical focus of international tribunals on criminal prosecutions rather than tort liability.

---

**232.** *Id.* ¶¶ 181, 195, 198. *Accord id.* ¶ 181 (machine guns and armored personnel carriers); ¶¶ 182–185 (artillery); *id.* ¶ 190 (other armaments); *id.* ¶ 191 (anti-aircraft cannons and ammunition).

**233.** To sustain this claim, the *Khulumani* plaintiffs must eventually demonstrate that the particular weapons provided by Rheinmetall and its subsidiaries to the South African Government were used in the incidents of extrajudicial killing alleged in the Complaint.

**234.** *See id.* ¶¶ 182, 186.

**235.** *See id.* ¶¶ 188–189.

**236.** *See id.* ¶¶ 190–191.

**237.** *See id.* ¶¶ 196, 198.

**238.** A company that provides substantial assistance to a rogue nation does not "acquire a stake in the criminal venture of the . . . regime." *Id.* ¶ 197.

**239.** *See* Reply Memorandum in Support of Defendants' Motion to Dismiss ("Def. Reply") at 35.

**240.** *See* Pl. Mem. at 64.

**241.** *See* Beth Stephens, *Sosa v. Alvarez–Machain*: *"The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts,* 70 Brook. L.Rev. 533, 560 (2004).

Piercing of the corporate veil reflects the protection provided to business organizations by domestic law.[242] Therefore, the question of alter ego liability does not raise the same universality concerns as does the recognition of individual torts under *Sosa*.[243]

On the other hand, vicarious liability is clearly established under customary international law, obviating any concerns regarding universality.[244] In particular, command responsibility—the military analogue to holding a principal liable for the acts of an agent—was firmly established by the Nuremberg Tribunals.[245] However, the international law of agency has not developed precise standards for this Court to apply in the civil context.[246] Therefore, I will apply federal common law principles concerning agency.

### 1. Piercing the Corporate Veil

■■■■ "In some instances, the corporate relationship between a parent and its subsidiary [is] sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other."[247] Courts pierce the corporate veil "to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary."[248] Veil piercing determinations are fact-specific and are highly sensitive to "the circumstances of each case."[249] A "parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness."[250]

■■■■ Factors that are relevant to determining whether a corporation's form should be respected include:

"(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7)

**242.** Although necessary formalities are established by the corporate law of the country of incorporation, the signs of an alter ego traditionally used by federal courts remain helpful in this analysis.

**243.** The broader concept of piercing the corporate veil has been recognized in the context of international law. *See, e.g.,* Francisco Orrego Vicuña, *The Protection of Shareholders Under International Law: Making State Responsibility More Accessible, in International Law Today: Essays in Memory of Oscar Schachter* 161, 162–63 (Maurizio Ragazzi ed., 2005).

**244.** *See, e.g.,* Nigel D. White & Sorcha MacLeod, *EU Operations and Private Military Contractors: Issues of Corporate and Institutional Liability,* 19 Eur. J. Int'l L. 965, 972 (2008) (quoting C.F. Amerasinghe, *Principles of the Institutional Law of International Organizations* 400 (2005)); M. Cherif Bassiouni, *The New Wars and the Crisis of Compliance with the Law of Armed Conflict by Non–State Actors,* 98 J.Crim. L. & Criminology 711, 774 (2008) (citing *Draft Articles on the Responsibility of States for Internationally Wrongful*

*Acts, Report of the ILC on the Work of Its Fifty-third Session,* UN GAOR, 56th Sess., Supp. No. 10 at 43, U.N. Doc A/56/10 (June 9, 2001)). The Second Circuit has previously applied an agency analysis in an ATCA case, although it assessed personal jurisdiction, which required the application of New York law. *See Wiwa,* 226 F.3d at 95–96.

**245.** *See* Control Council Law No. 10, art. II, *in* Taylor, *supra,* at 251.

**246.** Nor did the parties address this issue in their briefs.

**247.** *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 777 (2d Cir.1995).

**248.** *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l,* 2 F.3d 24, 26 (2d Cir.1993).

**249.** *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir.1988).

**250.** *Thomson–CSF,* 64 F.3d at 778 (citing *Carte Blanche,* 2 F.3d at 29).

whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." [251]

Finally, "[q]uestions relating to the internal affairs of corporations ... are generally decided in accordance with the law of the place of incorporation." [252]

## 2. Corporate Agency

■■■■ "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents ... in the scope of their authority." [253] However, "a parent corporation is not liable for acts of its subsidiaries simply because it owns the subsidiary's stock." [254] The level of control necessary to form a principal-agent relationship between a parent company and subsidiary "defies resolution by 'mechanical formula[e],' for the inquiry is inherently fact-specific." [255] Under federal common law,

> the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.[256]

However, such evidence need not be directly proven. Circumstantial evidence of a principal-agent relationship includes the exclusive dedication of a subsidiary to assisting the parent company, payment of the subsidiary's expenses by the parent company, and requests for approval of the parent company for important decisions by

**251.** *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir.2001) (quoting *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)).

**252.** *United States v. Funds Held in the Name of or for the Benefit of Wetterer*, 210 F.3d 96, 105 (2d Cir.2000) (citations omitted).

**253.** *Meyer v. Holley*, 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003). *Accord Bowoto v. Chevron*, 312 F.Supp.2d 1229, 1238 (N.D.Cal.2004) ("A parent company can be held vicariously liable for the acts of a subsidiary corporation if an agency relationship exists between the parent and the subsidiary."); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *13 n. 14 (S.D.N.Y. Feb. 28, 2002).

**254.** Restatement (Third) of Agency § 1.01 cmt. f(2) (citing *United States v. Bestfoods*, 524 U.S. 51, 62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)).

**255.** *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C.Cir. 2000) (quoting *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 633, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)).

**256.** *Id.* (citing Restatement (Second) of Agency § 1). *Accord Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 702–03 (2d Cir.1990) (mandating a finding of express agency " 'by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account' " or implied agency through " [a]pparent authority to do an act ... created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him' " (quoting Restatement (Second) of Agency §§ 26–27)).

the subsidiary.[257]

Even if a purported agent lacks actual authority, a principal also "is liable if it ratified the illegal acts."[258] " 'Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.' "[259] The acts of an agent are imputed to the principal "if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself."[260] Even mere acquiescence is sufficient to infer adoption of wrongdoing.[261] "Ratification also may be found to exist by implication from a principal's fail-

ure to dissent within a reasonable time after learning what had been done."[262]

## B. Discussion

At the motion to dismiss stage, the question "is not whether plaintiffs have proved the existence of an agency relationship, merely whether they should have the chance to do so."[263] Although *Twombly* certainly raised the bar concerning notice pleading, it did not eliminate Rule 8 or—more importantly—the Seventh Amendment. For that reason, I will not consider extrinsic evidence on this issue in deciding the pending motion.[264] On the other hand, "Purely conclusory allegations cannot suf-

257. See *Wiwa*, 226 F.3d at 95–96. See also In re Parmalat Secs. Litig., 375 F.Supp.2d 278, 295 (S.D.N.Y.2005) (seeking "direction and help" from the parent company creates a plausible inference of agency). *See generally Wiwa*, 2002 WL 319887, at *13 n. 14 ("By involving themselves directly in [the subsidiary's] activities, and by directing these activities, [the parent companies] made [their subsidiary] their agent with respect to the torts alleged in the complaint."). *But see Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1461–62 (2d Cir. 1995) ("The presence of a parent's logo on documents created and distributed by a subsidiary, standing alone, does not confer authority upon the subsidiary to act as an agent.").

258. *Phelan v. Local 305 of the United Ass'n of Journeymen*, 973 F.2d 1050, 1062 (2d Cir. 1992). *Accord Doro v. Sheet Metal Workers Int'l Ass'n*, 498 F.3d 152, 156 (2d Cir.2007) (recognizing that common law agency principles extend the right to sue a principal that ratifies the illegal act of an agent). *See generally Federal Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 98, 115 S.Ct. 537, 130 L.Ed.2d 439 (1984) (recognizing the doctrine of ratification under common law agency principles).

259. *Hamm v. United States*, 483 F.3d 135, 140 (2d Cir.2006) (quoting Restatement (Second) of Agency § 82 (1958)). *Accord Phelan*, 973 F.2d at 1062 ("Ratification occurs 'when the principal, having knowledge of the material facts involved in a transaction, evidences an

intention to ratify it.' " (quoting *Rodonich v. House Wreckers Union Local 95*, 817 F.2d 967, 973 (2d Cir.1987))).

260. *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir.1936).

261. *See In re Bennett Funding Group*, 336 F.3d 94, 101 (2d Cir.2003).

262. *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994). *Accord Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1388 (9th Cir.1987) (noting that attempting to conceal an agent's misdeeds rather than remedy them supports an inference of ratification).

263. *In re Parmalat Secs. Litig.*, 375 F.Supp.2d at 295. *Accord id.* at 294 (noting that a court may deny a motion to dismiss when "plaintiffs have made specific allegations from which an agency relationship could be inferred").

264. Plaintiffs have not had the opportunity to conduct discovery concerning the relationships between defendants and their South African subsidiaries; thus allowing the introduction of evidence outside of these Complaints would convert this motion to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(f). *See Sahu v. Union Carbide Corp.*, 418 F.Supp.2d 407, 415–16 (S.D.N.Y.2005).

fice to state a claim based on veil-piercing or alter-ego liability." [265]

### 1. Piercing the Corporate Veil

#### a. The *Ntsebeza* Complaint

■ Beyond conclusory assertions, the *Ntsebeza* plaintiffs do not make sufficient allegations to permit the case to proceed against any defendant on a veil-piercing theory. For example, even if—as plaintiffs allege—GM "simply maintained its business through its subsidiary so that it could continue to benefit from its participation in the crimes of the apartheid regime," [266] that does not undermine the legal distinction between GM and General Motors South Africa.

#### b. The *Khulumani* Complaint

■ The *Khulumani* Complaint similarly fails to present allegations that would support piercing the corporate veil of any defendant. Although GM, for example, allegedly "used its foreign subsidiary, GM [South Africa], to build the trucks and other vehicles that it sold to the South African security forces," [267] this in no way differs from an ordinary relationship between a parent corporation and a local sales and manufacturing subsidiary. The *Khulumani* plaintiffs—like the *Ntsebeza* plaintiffs—failed to allege any of the ten factors ordinarily applied to an alter ego inquiry in more than a conclusory manner.

### 2. Corporate Agency

#### a. The *Ntsebeza* Complaint

■ The *Ntsebeza* plaintiffs have made substantial allegations to support liability against a number of defendants under an agency theory. GM allegedly carried out its activities in South African through GM South Africa (Pty) Ltd., which was separately incorporated.[268] Senior management in GM South Africa allegedly included American personnel, who had been sent from GM.[269] Moreover, although GM purportedly "sold" GM South Africa to South African investors headed by local management in 1987, GM allegedly sent a senior manager from Detroit to South Africa to run the "new" company. Moreover, in 1997, GM allegedly executed a buy-back provision in the original sale agreement and now allegedly once again owns GM South Africa.[270] These specific allegations make the broader claim of agency asserted by the *Ntsebeza* plaintiffs plausible, on the theory either that GM South Africa carried out its activities on behalf of GM or that GM ratified those activities in order to profit from them.

Similarly, the allegations against Ford are sufficient to allow the case against it to proceed on an agency theory. From 1933 until 1985, Ford Motor Company of South Africa (Pty) Ltd. was allegedly a wholly-owned subsidiary of Ford Motor Company of Canada, itself a 76% owned subsidiary of Ford.[271] More importantly, Ford South Africa allegedly relied on American management and used parts shipped from Ford Canada and Ford England, in order to sell Ford vehicles without running afoul of U.S. trade restrictions.[272] In 1985, Ford South Africa underwent a merger result-

---

265. *In re Currency Conversion Fee Antitrust Litig.*, 265 F.Supp.2d 385, 426 (S.D.N.Y. 2003).

266. Pl. Mem. at 68.

267. *Khulumani* Complaint ¶ 278.

268. *See Ntsebeza* Complaint ¶ 84.

269. *See id.*

270. *See id.* ¶ 100.

271. *See id.* ¶ 101.

272. *See id.* ¶¶ 101–102.

ing in the creation of South African Motor Corporation (SAMCOR), which was 42% owned by Ford but allegedly continued to produce Ford-branded products using Ford parts and relying on Ford managers and engineers.[273] In 1987, Ford allegedly fully divested its ownership share in SAMCOR but neither repatriated the proceeds nor ceased its managerial relationship with the company.[274] These specific allegations again lend sufficient plausibility to the broader allegation of a principal-agent relationship between Ford and Ford Motor Company of South Africa (Pty) Ltd. or SAMCOR.

Daimler allegedly began its activities in South Africa through a contract relationship with Car Distribution Assembly, then later through United Car and Diesel Distributors after United Car purchased Car Distribution Assembly. In 1984, Daimler acquired a majority stake in United Car. Most importantly, Daimler allegedly oversaw all operations at the plant producing Mercedes cars in South Africa, and management in Germany was aware of and directly involved in the activities material to the Complaint.[275] At the motion to dismiss stage, these allegations are sufficiently plausible to allow this claim to proceed on a theory of vicarious liability.

▆▆▆ Finally, IBM allegedly carried out the activities described previously through a subsidiary, IBM South Africa.[276] IBM allegedly supplied products, parts, and expertise to the subsidiary, which then merely distributed these goods to South African customers.[277] Moreover, the *Ntsebeza*

plaintiffs allege that IBM engaged in a campaign to deliver products to South Africa in circumvention of export controls implicitly involving U.S. management.[278] After IBM sold its subsidiary to a group of local employees in 1987, IBM South Africa allegedly continued to serve as a mere conduit for IBM products and parts for the unlawful ends described above.[279] In 1992, IBM allegedly executed a buy-back provision in the 1987 divestment agreement in order to regain ownership of IBM South Africa.[280] These specific allegations are sufficient to support the broader allegation of vicarious liability.

Although the *Ntsebeza* plaintiffs cannot proceed on an alter ego theory, the claims against GM, Ford, Daimler, and IBM may proceed on a theory of agency liability.

### b. The *Khulumani* Complaint

▆▆▆ Unlike the *Ntsebeza* plaintiffs, the *Khulumani* plaintiffs have failed to provide specific allegations to buttress their broader claim of principal-agent relationships between each corporate defendant and the South African actors who carried out the acts detailed above. For example, the *Khulumani* plaintiffs allege that IBM and GM sold products to their former subsidiaries after divestment, allowing the former subsidiaries to continue to sell those products.[281] Absent assertions of a relationship between management of the parent company and its South African subsidiary, the allegations of agency liability are conclusory and do not meet the *Twombly* standard of plausibility.

---

273. *See id.* ¶¶ 103, 128.

274. *See id.* ¶ 128.

275. *See id.* ¶ 55.

276. *See id.* ¶ 129.

277. *See id.* ¶¶ 129–130, 140.

278. *See id.* ¶ 140.

279. *See id.* ¶ 141.

280. *See id.*

281. *See id.* ¶ 244; *id.* ¶ 286(GM).

However, the *Khulumani* plaintiffs have expressly requested leave to amend their Complaint in order to substantiate their alter ego and vicarious liability claims.[282] Given the success of the *Ntsebeza* plaintiffs in pleading an agency relationship between some defendants and their subsidiaries, the *Khulumani* plaintiffs may file an amended complaint supplementing their allegations with regard to relationships between defendants and their alleged agents.[283]

## IX. PRUDENTIAL DOCTRINES

The final ground on which defendants seek the dismissal of these actions are the prudential doctrines of comity and political question.[284] However, for the reasons discussed below, the limited actions that have survived this Court's analysis of defendants' other challenges need not be dismissed on these grounds.

### A. Factual Background

The South African Government and the Executive Branch of the United States have expressed their support for dismissal of these actions in formal statements of interest and various other pronouncements, including amicus briefs, resolutions, press releases, and even floor statements in the South African Parliament. The Governments of Germany, Switzerland, Canada and Britain have expressed similar views that these actions should be dismissed against their corporate domiciliaries.[285]

By contrast, Desmond Tutu—Chairman of the Truth and Reconciliation Commission of South Africa ("TRC") and Nobel laureate—and other TRC Commissioners submitted an amicus brief urging the Second Circuit to reinstate these actions. Archbishop Tutu had previously submitted two letters to the District Court opposing dismissal. Finally, Joseph Stiglitz, Nobel laureate and former Chief Economist of the World Bank, filed a letter with this Court rejecting the economic analysis relied upon by the United States and South African Governments in their Statements of Interest. I will discuss the most important of these statements in turn.

#### 1. United States Government Statements

On October 30, 2003, the Legal Advisor of the United States Department of State advised this Court "that continued adjudication of the above-referenced matters risks potentially serious adverse consequences for significant interests of the United States."[286] After outlining the objections of the Republic of South Africa, the Legal Advisor observed that the Republic of South Africa "is broadly representative of the victims of the apartheid regime" and "is uniquely charged with a popular mandate to deal with the legacy of apartheid."[287] Further, the Legal Advisor noted South Africa's concern that this litigation might hamper foreign investment in

---

**282.** *See* Pl. Mem. at 67 n.77.

**283.** Again, if the allegations in the amended *Khulumani* Complaint are similar to those made in the *Ntsebeza* Complaint, the outcome of any motion to dismiss will be the same. The exception of course concerns Fujitsu, who is not a defendant in the *Ntsebeza* case.

**284.** *See* Def. Mem. at 29–38.

**285.** Notably, no claims remain in these actions against Swiss, Canadian, or British defendants.

**286.** 10/30/03 Statement of Interest of the United States ("U.S. Statement of Interest") at 1, *reproduced at* 2 Defendants' Appendix of Declarations and Cited Materials ("Def. App.") 685.

**287.** *Id.*

South Africa.[288] The Legal Advisor concluded,

> [W]e can reasonably anticipate that adjudication of these cases will be an irritant in U.S.-South African relations. *To the extent that adjudication impedes South Africa's on-going efforts at reconciliation and equitable economic growth,* this litigation will also be detrimental to U.S. foreign policy interests in promoting sustained economic growth in South Africa.[289]

In addition, the Legal Advisor expressed concern over the chilling effect that suits of this kind may have on future foreign investment in developing countries, which is an important component of the United States foreign policy of constructive engagement.[290] The Legal Advisor concluded,

> *To the extent that the apartheid litigation in U.S. courts deters such investment,* it will compromise a valuable foreign policy tool and adversely affect U.S. economic interests as well as economic development in poor countries.[291]

Finally, in all of its submissions, the United States implicitly and explicitly characterized plaintiffs' claims—as well as the basic application of aiding and abetting liability under ATCA—as seeking liability simply for doing business in South Africa.[292]

## 2. South African Government Statements

On April 15, 2003, in response to the final report of the TRC, the President of the Republic of South Africa, Thabo Mbeki, made a public announcement of the programs that would be implemented to assist the victims of apartheid, including a one-time grant of 30,000 Rand (approximately $3,500) to individuals designated by the TRC.[293] President Mbeki then addressed the issue of "civil suits against corporations that benefitted from the apartheid system." [294] Although he reiterated that "there shall be no general amnesty

---

**288.** *See id.* at 1–2.

**289.** *Id.* at 2 (emphasis added). Similarly, in light of the "profound concern" expressed by other nations, "including Canada and Great Britain, ... that their banks, corporations and other entities have been named as defendants," the State Department "anticipat[ed] *possible,* continuing tensions in our relations with these countries over the litigation." *Id.* (emphasis added). The Legal Advisor also noted these nations' "strong belief that the issues raised in the litigation are most appropriately handled through South Africa's domestic processes." *Id.*

**290.** *See id.* ("[T]he prospect of costly litigation and potential liability in U.S. courts *for operating* in a country whose government implements oppressive policies will discourage the U.S. (and other foreign) corporations from investing in many areas of the developing world, where investment is most needed and can have the most forceful and positive impact on both economic and political conditions." (emphasis added)).

**291.** *Id.* at 2–3 (emphasis added).

**292.** *See* Brief of the United States as Amicus Curiae in Support of Petitioners at 1, *reproduced at* 2 Def. App. 688 ("[Plaintiffs] contend that, *by conducting business in South Africa,* petitioners aided and abetted violations of international law." (emphasis added)). *See also id.* at 21 (outlining policy implications if tort liability existed against companies that "invest or operate" in countries "with regimes whose policies the United States would like to influence"); U.S. Statement of Interest at 4 (objecting to litigation penalizing corporations "for operating in a country whose government implements oppressive policies").

**293.** *See* 4/15/03 Statement of Thabo Mbeki ("Mbeki Statement"), *reproduced at* 1 Def. App. 396.

**294.** Mbeki Statement at 8.

... [because] any such approach would fly in the face of the TRC process" and recognized "the right of citizens to institute legal action" and "the possibility for individual citizens to take up any grievance related to human rights violations with the courts," [295] President Mbeki stated,

[W]e consider it completely unacceptable that matters that are central to the future of our country should be adjudicated in foreign courts which bear no responsibility for the well-being of our country and the observance of the perspective contained in our Constitution of the promotion of national reconciliation.[296]

Similarly, President Mbeki rejected the "once-off wealth tax on corporations proposed by the TRC," emphasizing that the Government's approach is informed by "the desire to involve all South Africans, including corporate citizens, in a co-operative and voluntary partnership to reconstruct and develop South African society." [297]

Against this backdrop, South African Minister of Justice Penuell Mpapa Maduna filed a declaration stating that this "litigation appears to suggest that the government ... has done little or nothing about redressing the ravages of the apartheid system." [298] Further, Minister Maduna expressed concerns that this litigation would discourage foreign direct investment in South Africa.[299] Finally, Minister of Justice Maduna directly invoked international comity, insisting that this Court should "abstain from adjudicating" this case to avoid "interfer[ing] with [a] foreign sovereign's efforts to address matters in which it has the predominant interest." [300]

In response to the Second Circuit's decision in *Khulumani*, President Mbeki reiterated the South African Government's opposition to these suits. Although he noted that "what reparations were disbursed consequent to the recommendations of the TRC[ ] could only be symbolic as they could never comprehensively and adequately recompense any single person" and again underscored "the right of individuals or communities to pursue their *specific* grievances through the courts, within and outside South Africa," [301] he reiterated that "these matters should properly be addressed within South Africa's political and legal processes." [302]

### 3. Statements by TRC Commissioners

In stark contrast, Chairman Tutu and Commissioners of the TRC submitted an

295. *Id.* at 7–8.

296. *Id.* at 8. *Accord* Brief of *Amicus Curiae* Republic of South Africa in Support of Affirmance, at 2, *reproduced at* 2 Def. App. 645 ("[T]hese litigations interfere with [South Africa's] independence and sovereignty, including its sovereign right to determine, according to its internal political and constitutional order, how best to address apartheid's legacy."). On April 16, 2003, the Cabinet of the Republic of South Africa resolved, "It remains the right of the government to define and finalise issues of reparations, both nationally and internationally." 7/23/03 Declaration of Penuell Mpapa Maduna, Minister of Justice, Republic of South Africa ("Maduna Decl.") ¶ 7 *reproduced at* 2 Def. App. 627. However, this statement addressed a suit—

now dismissed—against two South African mining companies. *See id.* No South African defendants remain in these actions.

297. Mbeki Statement at 8.

298. Maduna Decl. ¶ 3.3

299. *See id.* ¶ 2.

300. *Id.* ¶ 13.

301. Hansard Debates of the National Assembly, Nov. 8, 2007, at 25–26 (S. Afr.) (Statement of President Mbeki), *reprinted at* 2 Def. App. 666 (emphasis added).

302. *Id.* at 25.

amicus brief to the Second Circuit stating, "There was absolutely nothing in the TRC process, its goals, or the pursuit of the overarching goal of reconciliation, linked with truth, that would be impeded by this litigation. To the contrary, such litigation is entirely consistent with these policies and with the findings of the TRC." [303] The Promotion of National Unity and Reconciliation Act ("TRC Act") created the TRC and charged it with investigating and documenting human rights violations committed under apartheid between March 1960 and May 1994.[304] The Act created a specific Amnesty Committee, which was given the power to grant civil and criminal amnesty to "persons who ma[de] full disclosure of all the relevant facts relating to acts associated with a political objective" committed in the course of conflicts related to apartheid.[305] The Amnesty Commission adjudicated each application for amnesty, and each grant of amnesty both obliged the Government to pay reparations to victims and precluded victims from seeking redress from those who received amnesty.

The TRC never contemplated that victims would be precluded from seeking compensatory damages from those liable for abuses, *unless* the TRC had granted that perpetrator amnesty. To the contrary, the Commission recognized that victims and their families have a right to institute civil proceedings unless the defendant applied for and was granted amnesty.[306]

Because the TRC Act afforded amnesty only to "persons," corporations likely were not qualified to receive amnesty by the terms of the Act and none sought to obtain amnesty. However, the TRC instituted a separate hearing on the business sector. The TRC concluded that "business involvement in gross violations of human rights during the apartheid era fell within a broad range of complicity," [307] including "direct involvement in shaping government policies or engaging in activities directly associated with repressive functions." [308] The TRC was not able to determine the full scope of corporate responsibility because it "was hampered by business's lack of active and forthcoming participation." [309]

Although some South African corporations offered meager cooperation, defendants in this litigation "did not appear at TRC hearings, and they have not acknowledged any complicity with the gross human rights violations of the South African government." [310]

The Commissioners' brief concluded:

The truth about apartheid—about its causes and effects ... about who was responsible for its maintenance—contin-

---

303. TRC Br. at 8 (emphasis added).

304. *See* Act 34 of 1995 (S. Afr.), *reproduced at* Pl. App. 1.

305. TRC Act preamble. *Accord* TRC Act § 20; 6 *Final Report of the Truth and Reconciliation Commission* 84 (2003), *available at* http://www.doj.gov.za/trc/report/.

306. TRC Br. at 8.

307. *Id.* at 9.

308. 6 *Final Report of the Truth and Reconciliation Commission* 140. *Accord Institutional*

*Hearing: Business and Labor* ¶¶ 26–30, *in* 4 *Final Report of the Truth and Reconciliation Commission* (2003), *reproduced at* Pl.App. 179 (describing "second order involvement" in human rights abuses as businesses knowing their products or services would be used for or contribute to repression and citing as an example the provision of armored vehicles to the police); *id.* ¶ 75 (finding that some businesses willingly manufactured products they "knew would be used to facilitate human rights abuses").

309. TRC Br. at 11.

310. *Id.* at 12–13.

ue to emerge. This litigation is one element of that emergence; it is not crude "victors' justice." It is just "justice." It is frankly puzzling why determining through this litigation the accountability under international law of defendants—who did not participate in the TRC process, and who simply deny liability—could even arguably be foreclosed by the TRC, its processes, or the policies embodied within it.[311]

Although corporations were probably not qualified to seek amnesty, nothing in the TRC Act amounted to an implicit grant of amnesty to multinational corporations. The initial TRC Report recognized that corporations could be held *criminally* liable for crimes against humanity,[312] and the final TRC Report recognized that corporations could be held civilly liable.[313] Further, because corporate organizations were *expressly* provided amnesty for vicarious liability in cases where their agents had received amnesty and where the agent had died, the TRC Act *implicitly* recognized that corporations could be held civilly liable in other circumstances.[314] Indeed, because most businesses had neither sought nor received amnesty—and because most businesses decided not to participate in the TRC business hearings—the TRC final report recommended that business "must be held accountable" outside the TRC process.[315]

### B. Applicable Law
#### 1. Case–Specific Deference

There are two ways in which prudential considerations may be addressed when a federal court is called upon to exercise its ATCA jurisdiction. *First,* as discussed above, recognition of a tort in violation of customary international law involves " 'an element of judgment about the practical consequences of making that cause available to litigants.' "[316] *Second,* the Supreme Court noted in *Sosa* that "in certain cases, other prudential principles might operate to 'limit[ ] the availability of relief in the federal courts for violations of customary international law.' "[317]

In the latter category, *Sosa*—in specific reference to *these* cases—noted that certain cases might require "a policy of case-specific deference to the political branches."[318] In cases where both a foreign government and the United States argue that allowing an ATCA case to proceed would interfere with domestic policies of a foreign nation, the Court suggested "that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy."[319] In the instant case, "[t]he parties agree that *Sosa*'s reference to 'case-specific defer-

---

**311.** *Id.* at 14.

**312.** *See The Mandate* appx. 1, ¶ 26, *in* 1 *Final Report of the Truth and Reconciliation Commission* (1998) (noting that "organizations or groups outside government are capable of committing crimes").

**313.** *See* TRC Br. at 7.

**314.** *See* TRC Act § 20(7)(a), (c) (describing the elimination of liability for a "body" or "organization"). *See also* TRC Br. at 8 ("The ability of the TRC to grant amnesty to qualifying applicants belies the notion that some policy embodied in the TRC amounted to an implicit grant of amnesty to multinational corporations.").

**315.** *Institutional Hearing: Business and Labor* ¶ 161.

**316.** *Khulumani,* 504 F.3d at 261 (quoting *Sosa,* 542 U.S. at 732–33, 124 S.Ct. 2739).

**317.** *Id.* (quoting *Sosa,* 542 U.S. at 732 n. 21, 124 S.Ct. 2739).

**318.** *Sosa,* 542 U.S. at 733 n. 21, 124 S.Ct. 2739.

**319.** *Id.* (citations omitted).

ence' implicates either the political question or international comity doctrine."[320]

Before reaching the intricacies of the political question and international comity doctrines, three comments are in order regarding *Sosa*'s footnote 21.[321] *First,* footnote 21 merely provides guidance concerning the need for deference with regard to foreign policy matters; it does not mandate summary dismissal of this case.[322] *Second,* the Executive Branch is not owed deference on every topic; rather this Court will give serious consideration to the Executive's views only with regard to the case's "impact on foreign policy."[323] *Third,* deference does not mean delegation; the views of the Executive Branch— even where deference is due—are but one factor to consider and are not dispositive.[324]

## 2. Political Question Doctrine

A "case-by-case" inquiry under the political question doctrine requires application of " 'six independent tests' identified by the Supreme Court in *Baker v. Carr*:"

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

[2] a lack of judicially discoverable and manageable standards for resolving it; or

[3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

[4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

320. *Khulumani,* 504 F.3d at 262 n. 10. Although *Sosa* additionally raised exhaustion as a possible prudential limitation, *see* 542 U.S. at 732 n. 21, 124 S.Ct. 2739, defendants have not claimed an exhaustion defense. Because exhaustion in the ATCA context is an affirmative defense, *see Sarei v. Rio Tinto, PLC,* 550 F.3d 822, 832 (9th Cir.2008) (en banc) (plurality opinion), this defense is waived.

321. The portion of that footnote relating to this case reads as follows: "[T]here are now pending in Federal District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. The Government of South Africa has said that these cases interfere with the policy embodied by its Truth and Reconciliation Commission, which 'deliberately avoided a "victors" justice' approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill.' The United States has agreed. In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Sosa,* 542 U.S. at 732 n. 21, 124 S.Ct. 2739 (internal citations omitted).

322. *See Khulumani,* 504 F.3d at 261 n. 9 (quoting *Sosa,* 542 U.S. at 733 n. 21, 124 S.Ct. 2739).

323. *Id.* The Executive Branch's interpretations of the applicable law and the allegations made in the Complaint " 'merit no special deference,' " as they are pure questions of law that are " 'well within the province of the Judiciary.' " *City of New York v. Permanent Mission of India to the United Nations,* 446 F.3d 365, 376, n. 17 (2d Cir.2006) (quoting *Republic of Austria v. Altmann,* 541 U.S. 677, 701, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004)).

324. *See Khulumani,* 504 F.3d at 263–64 & n. 13. In *Republic of Austria v. Altmann,* the only case cited in footnote 21, the Supreme Court was similarly hesitant to define the level of deference due to the State Department concerning the application of exemptions to the Foreign Sovereign Immunities Act ("FSIA"). *See* 541 U.S. at 702, 124 S.Ct. 2240 (noting that such opinions "might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy"). *See also id.* at 702 n. 23, 124 S.Ct. 2240 (holding that an executive interpretation cannot "trump considered application of the FSIA's more neutral principles").

[5] an unusual need for unquestioning adherence to a political decision already made; or

[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[325]

Satisfaction of any of any of these tests may support dismissal.[326]

The first three *Baker* factors will almost never apply in ATCA suits, which are committed to the judiciary by statute and utilize standards set by universally recognized norms of customary international law.[327] Further, the "fourth through sixth Baker factors appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests."[328]

■ "[I]n applying the fourth *Baker* test, courts have been particularly attentive to the views of the United States Government about the consequences of proceeding with litigation."[329] Nevertheless, "not every case 'touching foreign relations' is nonjusticiable and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights."[330] Accordingly, even in circumstances where deference is due, the Executive Branch's views will not prevail if they are "presented in a largely vague and speculative manner" or if the Executive's concerns are not "severe enough or raised with the level of specificity required to justify ... a dismissal on foreign policy grounds."[331]

### 3. International Comity

■ International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own

---

**325.** 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). *Accord Whiteman v. Dorotheum GmbH & Co. KG,* 431 F.3d 57, 70 (2d Cir.2005) (noting the continued use of these factors). "Not only does resolution of [foreign relations] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand a single-voiced statement of the Government's views." *Baker,* 369 U.S. at 217, 82 S.Ct. 691.

**326.** *See Whiteman,* 431 F.3d at 72.

**327.** *See Kadic,* 70 F.3d at 249.

**328.** *Id. Accord Vieth v. Jubelirer,* 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion) (noting that "[t]hese tests are probably listed in descending order of both importance and certainty"). In one prominent example, the Second Circuit dismissed Holocaust-related property claims because the Executive Branch had properly entered into an executive agreement with Austria that—by its express terms—could not take effect unless and until the litigation was dismissed. *See Whiteman,* 431 F.3d at 72–73.

**329.** *Whiteman,* 431 F.3d at 72 n. 17 (citing *Kadic,* 70 F.3d at 250). *Accord Alperin v. Vatican Bank,* 410 F.3d 532, 556–57 (9th Cir. 2005) (noting "the Executive Branch's continuing silence on the Holocaust Survivors' claims" but stating that "[h]ad the State Department expressed a view, that fact would certainly weigh in evaluating this fourth *Baker* formulation").

**330.** *Kadic,* 70 F.3d at 249. *Accord Whiteman,* 431 F.3d at 69 (" '[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.' " (quoting *Baker,* 369 U.S. at 211, 82 S.Ct. 691)); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione,* 937 F.2d 44, 49 (2d Cir.1991) ("[T]he doctrine is one of political questions, not one of political cases.").

**331.** *Permanent Mission of India,* 446 F.3d at 376 n. 17.

citizens or of other persons who are under the protection of its laws." [332] "The doctrine is not an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency." [333]

■■■ "The doctrine has never been well-defined," [334] and two distinct doctrines are often conflated under the heading "international comity." [335] Here the issue is comity among courts, "a discretionary deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." [336] "When a court dismisses on the ground of comity, it should ordinarily consider whether an adequate forum exists in the objecting nation and whether the defendant sought to be sued in the United States forum is subject to or has consented to the assertion of jurisdiction against it in the foreign forum." [337] However, "extreme cases might be imagined where a foreign sovereign's interests were so legitimately affronted by the conduct of litigation in a United States forum that dismissal is warranted without regard to the defendant's amenability to suit in an adequate foreign forum." [338]

■■■ "International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction." [339] There is no conflict for comity purposes " 'where a person subject to regulation by two states can comply with the laws of both.' " [340] If there is a true conflict, the decision whether to dismiss on comity grounds depends on the degree of legitimate offense to the foreign sovereign,[341] steps the foreign sovereign may have taken to address the issues in the litigation, and the extent of the United States' interest in the underlying issues.[342]

## C. Discussion

### 1. Political Question

■■■ As the Second Circuit recognized in *Kadic v. Karadzic*, the first three *Baker* factors do not apply to ATCA suits applying "universally recognized norms of inter-

**332.** *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

**333.** *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir.2005). *Accord Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971) (same).

**334.** *JP Morgan Chase Bank*, 412 F.3d at 423.

**335.** *In re Maxwell Comm. Corp.*, 93 F.3d 1036, 1047 (2d Cir.1996).

**336.** *Id.* International comity is also used to describe "a canon of [statutory] construction" that may "shorten the reach of a [domestic] statute." *Id.* This application of international comity is not at issue here.

**337.** *Jota*, 157 F.3d at 160.

**338.** *Id.*

**339.** *In re Maxwell Comm. Corp.*, 93 F.3d at 1049–50. *Accord Chavez v. Carranza*, 559 F.3d 486, 494–95 (6th Cir.2009) ("In order for an issue of comity to arise, there must be an actual conflict between the domestic and foreign law."); *In re Grand Jury Proceedings*, 40 F.3d 959, 964 (9th Cir.1994) ("A party relying on foreign law to contend that a district court's order violates principles of international comity bears the burden of demonstrating that the foreign law bars compliance with the order.").

**340.** *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 403 cmt. e).

**341.** *See Jota*, 157 F.3d at 160.

**342.** *See Bi v. Union Carbide Chems.& Plastics Co.*, 984 F.2d 582, 585–86 (2d Cir.1993). *See generally* Restatement (Third) of the Foreign Relations Law of the United States § 403(2)-(3) (elaborating factors relevant in cases of conflict).

national law."[343] Moreover, allowing these suits to continue would not contradict American foreign policy in a manner that would "seriously interfere with important governmental interests."[344] Therefore, the fourth through sixth *Baker* factors are similarly inapplicable to this case.

Defendants argue that "plaintiffs' claims call upon the judiciary to second-guess decisions made by the political branches *to permit and encourage commerce* with apartheid-era South Africa."[345] But this argument addresses different Complaints than those that the Court is now considering. The claims described above do not challenge the political branches' policy of constructive engagement with apartheid-era South Africa or aim "to hold defendants liable for engaging in commerce consistent with those policies."[346] Rather, to survive this motion to dismiss, plaintiffs must plausibly allege that defendants "substantially assisted" violations of the law of nations and knew that their assistance would be substantial. Merely engaging in commerce is insufficient. Thus it is a *non-sequitur* to argue that a suit alleging that a defendant wrongfully engaged in commerce would implicate the political question doctrine. Because the United States' Statement of Interest relies on the identical, erroneous premise, considerably less deference is owed to its ultimate conclusions.[347] To the extent the Executive Branch suggests that a prohibition on knowingly providing substantial assistance to violations of the law of nations would have a substantial chilling effect on doing lawful business in a pariah state, the suggestion is speculative at best. Moreover, the assertion in the Statement of Interest that this litigation "will compromise a valuable foreign policy tool" is true only "[t]o the extent that the apartheid litigation in U.S. courts deters such investment."[348] The Statement of Interest never states that this litigation *will* necessarily deter such investment, and there is no reason to believe based on the pleadings that these cases—viewed in light of the applicable law—will have such an effect.[349]

Nor would a determination that defendants aided and abetted the crimes of the apartheid regime lead to " 'embarrassment from multifarious pronouncements by various departments on one question.' "[350] At

---

343. 70 F.3d at 249.

344. *Id.*

345. Def. Reply at 17.

346. *Id.* at 17–18.

347. *See* U.S. Statement of Interest at 2 ("[T]he prospect of costly litigation and potential liability in U.S. courts for *operating* in a country whose government implements oppressive policies will discourage the U.S. (and other foreign) corporations from investing in many areas of the developing world."). The Executive Branch is not owed deference on its interpretation of plaintiffs' claims.

348. *Id.*

349. The Executive Branch raised an additional concern that "adjudication of these cases will be an irritant in U.S.-South African relations" both because of potential interference with South Africa's sovereign right to decide apartheid issues and because of potential discouragement of investment. U.S. Statement of Interest at 2. A speculative conflict with the goal of maintaining good relations with a foreign nation—as opposed to a conflict with the authority of the political branches—is not the type of conflict that normally triggers dismissal under the political question doctrine. *Cf. Whiteman*, 431 F.3d at 72–73 (interference with implementation of an executive agreement); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir.2007) (adjudication of whether sales financed by the United States violated customary international law). This issue is addressed below with regard to international comity.

350. Def. Reply at 18 (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. 691).

no point did the political branches instruct or authorize defendants' alleged conduct.[351] The distinction between this case and the Ninth Circuit's decision in *Corrie v. Caterpillar, Inc.* is illustrative. In *Corrie*, plaintiffs brought suit against Caterpillar for selling bulldozers to the Israeli Defense Forces ("IDF"), under a theory of aiding and abetting extrajudicial killing. The Ninth Circuit dismissed the action under the political question doctrine because the United States Government paid for the bulldozers, and finding Caterpillar liable for the sales would "necessarily require the judicial branch of our government to question the political branches' decision to grant extensive military aid to Israel."[352] In contrast, resolution of this case neither requires this Court to pass judgment on the policy of constructive engagement or the United States' relationship with apartheid-era South Africa.[353]

### 2. Comity

 The absence of conflict between this litigation and the TRC process is fatal to the argument that international comity requires dismissal. The TRC process was not exclusive—by its terms, only upon a grant of amnesty was the right of "victims and/or their families to institute criminal and/or civil proceedings ... extinguished."[354] Former President Mbeki and the TRC Report both acknowledged that a victim may sue those who declined to offer testimony to the TRC.[355] Defendants did not appear before the TRC. Plaintiffs have now come to this Court to exercise their rights.

Defendants do not argue—and South Africa has not claimed—that "an adequate forum exists in the objecting nation" to hear these suits or that defendants are "subject to or ha[ve] consented to the assertion of jurisdiction against it in the foreign forum."[356] Nor does this litigation conflict with the *goals* of the TRC process; thus it is not an "extreme case" requiring dismissal even without the existence of an alternative forum for the plaintiffs'

---

351. In fact, as the nature of assistance provided by American companies to specific acts of apartheid became clear, the political branches enacted specific prohibitions on such commerce. *See, e.g.,* Executive Order 12,532, 50 F.R. 36861 (Sept. 9, 1985) (barring the export of computers and information technology to "[a]ny apartheid enforcing agency" of the South African Government).

352. 503 F.3d at 982.

353. The absence of conflict distinguishes these cases from *Whiteman v. Dorotheum,* where the Second Circuit dismissed an action under the political question doctrine because "the United States Government established through an executive agreement an alternative international forum for considering the claims in question" and "the United States foreign policy advanced by the executive agreement [wa]s substantially undermined by the continuing pendency of th[at] case." 431 F.3d at 72–73. No foreign policy initiative—or formal executive agreement—would be "substantially undermined" by the continuing pendency of this case. Further, the United States has not attempted to establish an alternative forum for consideration of these claims.

354. 6 *Final Report of the Truth and Reconciliation Commission* 100. *Accord* TRC Act § 20(7).

355. *See, e.g.,* Mbeki Statement at 7–8. *Accord Chavez,* 559 F.3d at 494–95 (finding no true conflict where an amnesty provision barred domestic suits but not suits abroad). Thus these cases stand in stark contrast to *Bi v. Union Carbide Chemicals & Plastics Co.,* in which the claims of victims of an environmental disaster were dismissed in light of an Indian law that had granted the Indian Government exclusive authority to bring the claims and the Indian Government exercised that right to settle all claims in an Indian forum. *See* 984 F.2d at 583.

356. *Jota,* 157 F.3d at 160.

claims.[357] Defendants declined to participate in the TRC process and were not granted amnesty. As a result, the purposes of the TRC and this lawsuit are closely aligned: both aim to uncover the truth about past crimes and to confront their perpetrators. Although plaintiffs seek compensation for injuries resulting from defendants' alleged conduct, the TRC process provided immunity against suit only to those who testified voluntarily.[358] Further, it cannot be argued that South Africa instituted a policy of blanket immunity for corporations, given that the TRC Act implicitly recognized the possibility of corporate liability, the TRC Reports called for corporate liability outside the TRC process, and no one has asserted that South Africa sought to preclude corporate liability. Therefore international comity does not require dismissal of this suit.[359]

### D. Re-Soliciting Governmental Views

In light of this Court's determination that the political question doctrine and international comity do not require dismissal, there is no need to resolicit the views of the Executive Branch and the Government of South Africa.

## X. STATUTE OF LIMITATIONS

As an alternative argument for dismissal, defendants assert that these actions are barred by the applicable statute of limitations.[360] The Complaints do not allege any wrongful conduct by the defendants after 1991, and most allegations relate to conduct in the 1970s and 1980s. The Complaints were originally filed in 2002. In light of the applicable ten-year statute of limitations, discussed below, the actions are not timely absent some form of tolling. Under equitable tolling, as well as *American Pipe* tolling and the doctrine of relation back, these cases are not barred on statute of limitations grounds.

The *Ntsebeza* Complaint sets forth two bases for tolling:

> Equitable tolling applies ... because there was no practical, or safe or effective way for Plaintiffs to bring these claims without risk of retaliation by the apartheid state prior to 1994. In addition, Defendants refusal to cooperate with the TRC and provide full accounting of their connection to the violations alleged in this complaint tolls the running of the statute of limitations with respect to plaintiffs' claims.[361]

**357.** *Id.*

**358.** Defendants argue that the real issue is not whether defendants were granted amnesty but "whether a federal court should interfere with South Africa's stated preference that its democratically elected government provide the *exclusive mechanisms* to address harms inflicted by the apartheid-era South African government on South African citizens in South Africa." Reply Br. at 23 (emphasis added). It is not clear to what "exclusive mechanisms" defendants are referring. The TRC process was explicitly *not* exclusive and defendants have pointed to no other South African forum that has, can, or will adjudicate these claims.

**359.** Although both the American and South African Governments assert that the potential of this lawsuit to deter future investment in South Africa mandates dismissal, this concern is not addressed by the doctrine of international comity. Moreover—even granting deference to their views—I am persuaded by the forceful rejection of this economic argument by Nobel Prize-winning economist Joseph Stiglitz. *See* 8/6/03 Letter from Joseph E. Stiglitz to the Court, *reproduced at* Pl.App. 281 (arguing that suits seeking to hold foreign companies accountable for their unlawful collaboration with a *prior regime* will not discourage foreign investors from investing in that country in the future).

**360.** *See* Def. Mem. at 42–47.

With regard to the impracticality of gathering evidence prior to 1993 due to threats of retaliation, the *Khulumani* Complaint alleges that:

> Between 1990 and 1993, over 12,000 civilians were killed and at least 20,000 injured by the security forces of apartheid South Africa.... The numbers of assassinations of anti-apartheid leaders also increased from 28 in 1990, to 60 in 1991 and 97 in 1993.[362]

Although a formal agreement for non-racial elections was made in 1993, the apartheid regime did not officially end until 1994 with the election of Nelson Mandela in the first universal suffrage general election in South African history.[363]

The TRC held hearings between 1996 and early 2002 and issued its final report in March 2003.[364] As part of this process, hearings were held on the role of businesses in the apartheid regime. In the final report on the business hearings, the TRC lamented "the failure of multinational corporations to make submissions at the hearing," which "was greatly regretted in view of their prominent role in South Africa's economic development under apartheid."[365] According to a submission filed in this case by the TRC Commissioners, these defendants "did not even respond to [the TRC's] invitation to participate in the business hearings."[366] As a result, the TRC was unable to detail the scope and nature of defendants' involvement in advancing apartheid.

## A. Applicable Law

### 1. Equitable Tolling

 Statute of limitations defenses are affirmative defenses, which normally cannot be decided on a motion to dismiss. However, "an exception is made where the complaint *facially* shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."[367] Similarly, when plaintiffs raise an equitable tolling argument, a court must deny a motion to dismiss based on the statute of limitations "unless 'all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that this statute was tolled.'"[368]

---

**361.** *Ntsebeza* Complaint ¶ 39.

**362.** *Khulumani* Complaint ¶ 84.

**363.** *See id.* ¶¶ 84–85.

**364.** *See Ntsebeza* Complaint ¶ 87.

**365.** *Institutional Hearing: Business and Labor* ¶ 161. *Accord Khulumani* Complaint ¶ 89 (" 'Business failed in the hearings to take responsibility for its involvement in state security initiatives specifically designed to sustain apartheid rule.' " (quoting *Institutional Hearing: Business and Labor* ¶ 166)).

**366.** TRC Br. at 12.

**367.** *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 1 (3d Cir.1994) (emphasis added). *Accord Trevino v. Union*

*Pacific R.R.,* 916 F.2d 1230 (7th Cir.1990); 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed.2004).

**368.** *Mirman v. Berk & Michaels, P.C.,* No. 91 Civ. 8606, 1992 WL 332238 (S.D.N.Y. Oct.30, 1992) (quoting *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980)). In light of *Twombly,* it is arguable that this rule should be altered to state that a court must deny a statute of limitations defense on a motion to dismiss unless all assertions in the complaint, read with the required liberality, fail to make it *plausible* that the limitations period should be tolled. However, this assumes that equitable tolling must be pleaded in the same manner as an affirmative element of a claim. That assumption cannot be correct given that the statute of limitations defense remains an affirmative *defense,* which plaintiffs are not, by definition, required to defeat in the plead-

■ "The basic question to be answered in determining whether, under a given set of facts, a statute of limitations is to be tolled, is one of legislative intent whether the right shall be enforceable . . . after the prescribed time." [369] The relevant "legislative intent" is gleaned from "the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act." [370] If the Act so permits,

> When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply. [371]

The ATCA does not contain a statute of limitations. However, the TVPA—which is appended as a statutory note to the ATCA—provides the applicable limitations period of ten years for ATCA claims. [372] In light of the TVPA's explicit purpose to "protect[ ] . . . human rights," [373] and "because regimes that commit the most serious human rights abuses often possess the most woefully inadequate legal mechanisms for redressing those abuses," [374] courts have uniformly held that the TVPA statute of limitations is subject to equitable tolling. [375]

■ In ATCA cases alleging *state-sponsored* violations of international law, courts have been especially willing to toll the statute of limitations during the time the abusive *government* remains in power.

> The quest for domestic and international legitimacy and power may provide regimes with the incentive to intimidate witnesses, to suppress evidence, and to commit additional human rights abuses against those who speak out against the regime. Such circumstances exemplify "extraordinary circumstances" and may require equitable tolling so long as the perpetrating regime remains in power. [376]

In *Arce v. Garcia*, the Eleventh Circuit held that the district court was well within its discretion to hold that the limitations period did not *begin* to run until the allegedly abusive El Salvadorian regime left power because "the record swell[ed] with evidence regarding the brutality and oppression that the Salvadoran military visited upon the people of El Salvador." [377] The court explained:

---

ings. Thus, the better view is that the *Jablon* formulation is still correct. Nor is the issue squarely presented in this case, as the result would be the same under either standard.

**369.** *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 426, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965) (quotation marks omitted) (alteration in original).

**370.** *Id.* at 427, 85 S.Ct. 1050.

**371.** *Zerilli–Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir.2003) (quotation marks omitted).

**372.** *See, e.g., Chavez*, 559 F.3d at 493–94; *Arce v. Garcia*, 434 F.3d 1254, 1261–62 (11th Cir.2006); *Van Tu v. Koster*, 364 F.3d 1196,

1199 (10th Cir.2004). The parties agree. *See* Def. Mem. at 43; Pl. Mem. at 55.

**373.** TVPA, Pub.L. No. 102–256, preface, 106 Stat. 73, 73 (1992).

**374.** *Arce*, 434 F.3d at 1262.

**375.** *See id. See also Chavez*, 559 F.3d at 493–94; *Cabello Barrueto v. Fernandez–Larios*, 402 F.3d 1148, 1155 (11th Cir.2005); *Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir.1996); *Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F.Supp.2d 230 (D.D.C. 2005); *Forti v. Suarez–Mason*, 672 F.Supp. 1531, 1550 (N.D.Cal.1987).

**376.** *Arce*, 434 F.3d at 1263.

**377.** *Id.* at 1264.

The remedial scheme conceived by the TVPA and the ATCA would fail if courts allowed the clock to run on potentially meritorious claims while the *regime responsible* for the heinous acts for which these statutes provide redress remains in power, frightening those who may wish to come forward from ever telling their stories.[378]

When equitable tolling extends the start date of the limitations period, the courts of appeals are divided as to whether plaintiffs receive the full limitations period once the tolling ends.[379] The Second Circuit has not addressed this question. In those circuits holding that plaintiffs do not necessarily enjoy the full period, plaintiffs must file their claims within a "reasonable" period after the toll expires, exercising diligence.[380]

## 2. Relation Back

Federal Rule of Civil Procedure 15(c)(1)(B) provides, "An amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." "The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities."[381] "For a newly added action to relate back, the basic claim must have arisen out of the conduct set forth in the original pleading."[382] Under Rule 15, the "central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading."[383] "Where the amend-

378. *Id.* at 1265 (emphasis added). *Accord Chavez*, 559 F.3d at 493–94 ("In such limited circumstances, where plaintiffs legitimately fear reprisals against themselves or family members from the regime in power, justice may require tolling. These circumstances, outside plaintiffs' control, make it impossible for plaintiffs to assert their TVPA and ATS claims in a timely manner."); *Cabello*, 402 F.3d at 1155 (tolling the statute of limitations until the Chilean military dictatorship lost power because, up to that point, "the Chilean political climate prevented the Cabello family from pursuing any efforts to learn of the incidents surrounding Cabello's murder"); *Hilao*, 103 F.3d at 773 (tolling the statute of limitations for ATCA claims against former Philippine dictator Ferdinand Marcos until the Marcos regime was overthrown because, *inter alia*, "many victims of torture in the Philippines did not report the human-rights abuses they suffered out of intimidation and fear of reprisals"); *Forti*, 672 F.Supp. at 1550 (denying the defendant's motion to dismiss an ATCA claim on statute of limitations grounds because the complaint alleged that the "military's reign of terror" caused such a breakdown of the Argentine legal system that the plaintiffs "were denied effective access to Argentine courts" until the end of the military dictatorship).

379. *Compare Cabello*, 402 F.3d at 1156 ("[S]tatutory clock is stopped while tolling is in effect . . . [and thus] statutory period does not begin to run until the impediment to filing a cause of action is removed.") *and Socop–Gonzalez v. INS*, 272 F.3d 1176, 1194–96 (9th Cir.2001) (same) *with Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452 (7th Cir.1991) (holding that tolling provides only a reasonable extension of time to file). *See also Simon v. Republic of Iraq*, 529 F.3d 1187, 1195 (D.C.Cir.2008), *cert. granted*, —— U.S. ——, 129 S.Ct. 894, 172 L.Ed.2d 769 (2009) (noting internal D.C. Circuit conflict on the issue).

380. *See Phillips v. Heine*, 984 F.2d 489, 492 (D.C.Cir.1993) (holding that tolling "gives the plaintiff extra time only if he needs it"; that is, plaintiff obtains a "reasonable" extension). *See also Cada*, 920 F.2d at 452 (same).

381. *Slayton v. American Exp. Co.*, 460 F.3d 215, 228 (2d Cir.2006) (quotation marks omitted).

382. *Id.* (quotation marks omitted).

383. *Id.* (quotation marks omitted).

ed complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs." [384]

Rule 15(c)(1)(C) provides:

An amendment to a pleading relates back to the date of the original pleading when the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Rule 15(c)(1)(C) only addresses the addition of new defendants. Nevertheless, the Advisory Committee Note states that "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs." "Courts have, however, disagreed concerning precisely how to apply 'the attitude' of Rule 15(c) to amendments adding new plaintiffs." [385] All courts agree that the notice and prejudice prongs apply, but there is disagreement concerning whether the failure originally to name the newly added plaintiff must have been the result of a mistake within the meaning of Rule 15(c)(1)(C).

In a one paragraph per curiam opinion, the Second Circuit once endorsed a district court's application of the mistake requirement to the addition of a plaintiff, but that case involved unique concerns pertaining to piggybacking employment discrimination claims.[386] Courts in this Circuit have more recently rejected the suggestion that amendments seeking to add new plaintiffs must satisfy Rule 15(c)(1)(C)'s "mistake" requirement.[387] Judge Jack B. Weinstein has observed that Rule 15(c)(1)(C)'s mistake requirement, "by its express language, appears not to be relevant when adding a plaintiff." [388] "Nor is requiring the plaintiff to demonstrate a 'mistake' consistent with the liberal 'attitude' of Rule 15, which is to permit amendment of pleadings to encourage resolution of claims on the merits." [389]

■ Prejudice in Rule 15 means legal prejudice, not the practical prejudice of being subject to greater awards.[390] Thus, the question is whether the late addition of a plaintiff would " 'surprise and frustrate reasonable possibilities for a defense.' " [391]

### 3. *American Pipe* Tolling

In *American Pipe & Construction Co. v. Utah,* the Supreme Court held that "the

---

**384.** *Id.*

**385.** *In re Gilat Satellite Networks, Ltd.,* No. 02 Civ. 1510, 2005 WL 2277476, at *25 (E.D.N.Y. Sept. 19, 2005).

**386.** *See Levy v. U.S. Gen. Accounting Office,* 175 F.3d 254 (2d Cir.1999).

**387.** *See id.* (discussing cases).

**388.** *In re Simon II Litig.,* 211 F.R.D. 86, 145 (E.D.N.Y.2002), *vacated on other grounds by* 407 F.3d 125 (2d Cir.2005).

**389.** *In re Gilat,* 2005 WL 2277476, at *26.

**390.** *See In re Simon II Litig.,* 211 F.R.D. at 146 (noting that an amendment is not prejudicial "if the conduct relied upon does not change appreciably, defendants' opportunity to defend is not appreciably adversely affected, and the defendant should have appreciated that the new plaintiff's claims were similar to the ones originally stated and might well be prosecuted").

**391.** *In re Gilat,* 2005 WL 2277476, at *26 (quoting *In re Simon II Litig.,* 211 F.R.D. at 146).

commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class . . . ." [392]

The theoretical basis on which *American Pipe* rests is the notion that class members are treated as parties to the class action "until and unless they received notice thereof and chose not to continue." Because members of the asserted class are treated for limitations purposes as having instituted their own actions, at least so long as they continue to be members of the class, the limitations period does not run against them during that time.[393]

## B. Discussion

### 1. Equitable Tolling

▉ Plaintiffs have sufficiently alleged that, through 1993, the political climate in South Africa prevented them from gathering evidence, interviewing witnesses, or otherwise taking the initial steps required to commence litigation. Political killings were common through 1993. The oppressive apartheid regime was still in place. Although defendants argue that the "apartheid regime had been effectively dismantled well before" 1994, and probably in 1991,[394] it would be inappropriate to resolve these factual disputes on a motion to dismiss.[395]

There is no need to decide whether tolling stops the statute of limitations clock because—even if it does not—the question of whether it was unreasonable for plaintiffs to wait until 2002 to file their claims requires factual development. The *Khulumani* Complaint discusses—for example—the tremendous time and energy required for plaintiffs to file their TRC grievances. It is not clear that a diligent and reasonable plaintiff would have had time to participate in that lengthy and difficult process and simultaneously to prepare a lawsuit. Further, defendants' refusal to participate in the TRC process made it much more difficult for plaintiffs to amass the evidence to prosecute their claims. A reasonable plaintiff may have assumed that defendants would participate in the TRC process, in which case plaintiffs would have had no need to conduct an independent investigation into defendants' conduct. Indeed, it likely would have been an affront to the integrity of the TRC process for plaintiffs to have conducted an independent investigation or commenced these lawsuits while the TRC process continued. In short, the motion to dismiss these cases on statute of limitations grounds is denied.[396]

### 2. Relation Back and *American Pipe* Tolling

In remanding this case, the Second Circuit instructed this Court to decide in the first instance whether to allow plaintiffs to amend their Complaints in order to "narrow their claims and clarify the nature of their allegations against the various defendants." [397] After this Court granted plain-

---

**392.** 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974).

**393.** *In re WorldCom Secs. Litig.*, 496 F.3d 245, 255 (2d Cir.2007) (quoting *American Pipe*, 414 U.S. at 551, 94 S.Ct. 756).

**394.** Def. Mem. at 45.

**395.** It is telling that defendants cite a law, effective on April 27, *1994*, that dismantled a legal regime "dividing black South Africans into eight groups and mandating that each homeland had to govern itself independently from the white government." Def. Reply at 30.

**396.** Defendants may raise this argument again on summary judgment, when statute of limitations defenses are more appropriately adjudicated.

**397.** *Khulumani*, 504 F.3d at 263.

tiffs leave to amend, plaintiffs filed the Amended Complaints in October 2008.

Because the Amended Complaints simply clarify the nature of the allegations, by stating more clearly what plaintiffs *attempted* to set forth in 2002, the Complaints relate back within the meaning of Rule 15(c)(1)(B). The remaining question is whether the addition of new parties relates back.

There are three areas of concern. *First,* in the *Khulumani* action, the original Complaint was brought only by *individual* plaintiffs, whereas the Amended Complaint is brought in the name of several proposed *classes*. *Second,* Fujitsu is named as a defendant in a *class* action for the first time in the amended *Khulumani* Complaint although it had been named as a defendant by individual plaintiffs. *Third,* in the *Ntsebeza* action, the original Complaint named Daimler Chrysler Corporation ("Daimler Corp.") but not Daimler Chrysler A.G. ("Daimler A.G."), whereas the Amended Complaint names Daimler A.G. but not Daimler Corp. I discuss each addition in turn.

### a. *Khulumani* Complaint: New Class

The *Khulumani* plaintiffs argue that the filing of the *Ntsebeza* action tolled the statute of limitations for the *Khulumani* class because the *Khulumani* class members were all in the *Ntsebeza* class, the *Ntsebeza* allegations put the defendants on notice of the *Khulumani* allegations, and—with the exception of Fujitsu—the defendants are the same. Plaintiffs argue that "proposed class members may file separate class actions alleging the same unlawful conduct by the same defendants named in the original class action." [398] Plaintiffs are right. It follows straightforwardly from *American Pipe:*

upon the filing of the *Ntsebeza* class action the statute of limitations period was suspended for all members of the *Ntsebeza* class with respect to the claims made in the *Ntsebeza* action raised against the *Ntsebeza* defendants. Because no motion to certify the class has been adjudicated, this toll is still in place.

### b. *Khulumani* Complaint: Fujitsu

In *Khulumani,* there is a special problem with respect to the class allegations against Fujitsu: although Fujitsu was named in the original *Khulumani* action brought by individual plaintiffs, Fujitsu, unlike the other *Khulumani* defendants, was not named as a defendant in the *Ntsebeza* action. Thus, *American Pipe* tolling does not apply. Accordingly, the question is whether new plaintiffs may be added to the *Khulumani* action, which named Fujitsu, in keeping with the "attitude" of Rule 15(c)(1)(C). Specifically, the issues are whether Fujitsu had adequate notice of the claims of the newly added plaintiffs and whether the late assertion of their claims would "surprise and frustrate reasonable possibilities for a defense." [399]

Regarding notice, the Amended Complaint in *Khulumani* merely amplifies the original allegations against Fujitsu with more specific facts and adds to the list of people who were harmed by Fujitsu's alleged conduct. The addition of new plaintiffs does not change the nature of the allegation: that Fujitsu aided and abetted crimes of apartheid through the creation of software designed to facilitate apartheid control. Thus, Fujitsu has had adequate notice of the allegations against it since the time the action was first filed.

Similarly, the addition of the class plaintiffs does not create undue *legal* prejudice.

---

398. Pl. Mem. at 59.

399. *In re Simon II Litig.,* 211 F.R.D. at 146.

Because the nature of the allegations is the same, the addition of more plaintiffs does not frustrate Fujitsu's ability to prepare a legal defense. This is especially true where—as here—there has been no discovery and the motion to dismiss is still pending. To be sure, Fujitsu may be exposed to much greater liability, but that does not constitute legal prejudice within the meaning of Rule 15.[400]

### c. *Ntsebeza* Complaint: Daimler A.G. for Daimler Corp.

■ In the *Ntsebeza* action, the issue is whether the substitution of Daimler A.G. for Daimler Corp. in the Amended Complaint should relate back to the original Complaint within the meaning of Rule 15(c). For the same reasons discussed above, the notice and prejudice prongs of Rule 15(c)(1)(C) are easily met. The only question is whether naming Daimler Corp. rather than Daimler A.G. in the original Complaint was a mistake that Daimler A.G. should have known about. The original *Ntsebeza* Complaint incorrectly identified Daimler Corp. as having its international headquarters in Germany. Daimler A.G., not Daimler Corp., is headquartered in Germany. This is exactly the sort of mistake that Rule 15(c) contemplates. Further, even if plaintiffs intended to name Daimler Corp. in 2003, the complex corporate structure of the Daimler corporations make it difficult to hold as a matter of law that plaintiffs were not mistaken in originally thinking that Daimler Corp. was the real party in interest.

## XI. STANDING

As a final note, although defendants do not challenge the standing of individual plaintiffs to bring these suits, defendants do contest the standing of the Khulumani Support Group ("KSG"), an organization that brings suit on its own behalf and not on behalf of its members.[401] Survivors of apartheid and the families of victims formed KSG in 1995, in response to the creation of the TRC.[402] KSG's "primary purpose was to ensure that the victims had the support they needed in order to speak out about their personal experiences of human rights atrocities committed during the apartheid regime." [403] In 1998, KSG's activities expanded to include outreach— such as health services and educational programs—intended to aid the reconciliation of the victims of apartheid.[404]

### A. Applicable Law

■ In order to invoke the jurisdiction of the federal courts, a party must "satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." [405] Specifically,

---

**400.** For this reason, defendants' reliance on *Korwek v. Hunt,* 827 F.2d 874 (2d Cir.1987), is misplaced. There, the Second Circuit held that "the tolling rule established by *American Pipe* ... was not intended to be applied to suspend the running of statutes of limitations for class action suits filed *after* a definitive determination of class certification." *Id.* at 879 (emphasis added). Here, by contrast, there has been no determination of class certification.

**401.** *See Khulumani* Complaint ¶ 18. *Accord* Pl. Mem. at 63 (noting that KSG does not assert associational standing).

**402.** *See Khulumani* Complaint ¶ 18. KSG has 55,000 members who are survivors of apartheid violence; it operates seventy community-based chapters and employs eight full-time staff members. *See id.*

**403.** *Id.* Khulumani means "Speak Out" in Zulu. *See id.*

**404.** *See id.*

**405.** *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (citations omitted).

Article III standing consists of three irreducible elements: (1) injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief.[406]

As a general rule, the "injury-in-fact" requirement means that a plaintiff must have personally suffered an injury, rather than having a general grievance.[407] "The party invoking federal jurisdiction bears the burden of establishing these elements ... with the manner and degree of evidence required at the successive stages of the litigation."[408] Accordingly, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."[409]

▇▇▇▇ An organization "may file suit on its own behalf 'to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'"[410] When an organization sues on its own behalf, "the organization must meet the same standing test that applies to individuals by showing actual or threatened injury in fact that is fairly traceable to the alleged illegal action and

likely to be redressed by a favorable court decision."[411] "Conversely, 'an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III.'"[412]

In *Havens Realty Corporation v. Coleman*, the Supreme Court held that a fair housing organization that "had to devote significant resources to identify and counteract [the defendants'] racially discriminatory steering practices" suffered an actionable injury in fact.[413] The Court explained that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."[414]

In *Ragin v. Harry Macklowe Real Estate Co.*, the Second Circuit applied *Havens Realty* in holding that a fair housing organization had standing to claim that defendants' real estate advertisements violated the Fair Housing Act because the organization "devoted substantial blocks of time to investigating and attempting to remedy the defendants' advertisements" through legal means and community outreach efforts.[415] This constituted a concrete injury to the organization because— in part—the legal efforts *"prevented*

---

**406.** *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106–07 (2d Cir.2008) (quotation marks omitted).

**407.** *Id.* at 107 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n. 1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

**408.** *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

**409.** *Id.*

**410.** *Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir.1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

**411.** *Id.* (quotation marks omitted) (alterations removed).

**412.** *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir.1993) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

**413.** 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (quoting the Complaint).

**414.** *Id.*

**415.** 6 F.3d at 905.

[some organization members] from devoting their time and energies to other [agency] matters" and the organization was thereby "forced to 'devote significant resources to identify and counteract' the defendants' advertising practices and did so to the *detriment* of their 'efforts to [obtain] equal access to housing through counseling and other referral services.' "[416] In accordance with *Havens Realty* and *Ragin,* other Circuits require "a direct conflict between the defendant's conduct and the organization's mission."[417]

 "If an 'organization' seems to have been formed specifically for the purpose of bringing an action, standing may be denied to protect standing doctrine against the mere will of a would-be plaintiff."[418] If standing were allowed in such circumstances, "persons with only a 'generalized grievance[ ],' concededly insufficient for standing, . . . could simply form an organization to advance their grievance, and, whenever an agency decision offended their position, secure standing by asserting that it had thrown practical roadblocks in the way of the organization's success."[419]

## B. Discussion

 KSG was *formed* to counteract the specific harms that these defendants allegedly perpetrated, and KSG has a clear "organizational stake" in the outcome of this litigation.[420] Nonetheless, KSG lacks standing for two reasons.

*First,* the *Khulumani* Complaint does not allege that the time and resources KSG spent counteracting the harms of apartheid were *diverted* from KSG projects. Rather, because the purpose of KSG is to counteract the harms of apartheid, efforts spent in that pursuit cannot constitute a *detriment* to the group's mission or activities. To be sure, the *Khulumani* Complaint may fairly be interpreted to allege that defendants' failure to participate in the TRC process caused KSG to expend far greater resources to vindicate the rights of its members than it otherwise would have, to the detriment of other direct aid projects sponsored by the group. However, the organizational injury (so described) is not fairly traceable to the

---

416. *Id.* (quoting *Havens Realty,* 455 U.S. at 379, 102 S.Ct. 1114) (emphases added). *Accord Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1526 (7th Cir.1990) ("[T]he only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.").

417. *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129, 132–33 (D.C.Cir.2006). *Accord Alexander v. Riga,* 208 F.3d 419, 427 n. 4 (3d Cir.2000) ("[A] fair housing organization [has] standing to sue if the discriminatory acts impair[ ] the organization's ability to carry out its mission."); *American Legal Found. v. FCC,* 808 F.2d 84, 91–92 (D.C.Cir.1987) (noting that to establish injury to its own interests, the "organization must allege that discrete programmatic concerns are being directly and adversely affected").

418. 13A Wright & Miller, *supra,* § 3531.9.5. *See also id.* (noting that a contrary rule "would support a great expansion of association standing, effectively destroying the general rule that simple interest in a problem is not sufficient to give standing"); *Animal Lovers Volunteer Ass'n Inc. (A.L.V.A.) v. Weinberger,* 765 F.2d 937, 939 (9th Cir.1985) ("While an organization's standing is not simply a function of its age or fame, those factors become highly relevant when the organization . . . has no history which antedates the legal action it seeks to bring, and can point to no activities which demonstrate its interest, other than pursuing a legal action.").

419. *Hazardous Waste Treatment Council v. U.S. EPA,* 861 F.2d 277, 286–87 (D.C.Cir. 1988) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 217, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).

420. *A.L.V.A.,* 765 F.2d at 939.

defendants' alleged *unlawful* conduct because the alleged tort is aiding and abetting the crimes of apartheid, not failing to participate in the TRC process.

*Second,* and more important, permitting KSG's claim to proceed would effect an unwarranted expansion of the standing doctrine. KSG was formed in response to—and with the aim to remedy—the torts at issue in this lawsuit. At the time of KSG's formation, *after* the alleged torts had occurred, the group—as opposed to its members—had only a generalized grievance against defendants. A generalized grievance is insufficient to support standing. If KSG had standing, then so would any group formed to remedy a third-party's wrongs that spends significant resources in that effort. In such a jurisprudential landscape, *every* generalized grievance could be readily transformed into a concrete organizational injury. This would undermine the law of standing. Therefore, KSG's claims are dismissed.[421]

## XII. CONCLUSION

What remains of these consolidated cases is vastly different from the dozen actions first filed in 2002 and 2003. Corporate defendants accused of merely doing business with the apartheid Government of South Africa have been dismissed. Claims that a corporation that aided and abetted particular acts could be liable for the breadth of harms committed under apartheid have been rejected. What survives are much narrower cases that this Court hopes will move toward resolution after more than five years spent litigating motions to dismiss.

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' motion to resolicit the views of the Governments is denied. The following claims remain:

· *Ntsebeza* plaintiffs against Daimler, GM, and Ford for aiding and abetting torture, CIDT, extrajudicial killing, and apartheid.

· *Ntsebeza* plaintiffs against IBM for aiding and abetting arbitrary denationalization and apartheid.

· *Khulumani* plaintiffs against Rheinmetall for aiding and abetting extrajudicial killing and apartheid.

The following claims are dismissed with leave to amend:

· *Khulumani* plaintiffs against IBM and Fujitsu for aiding and abetting apartheid.

· *Khulumani* plaintiffs against Daimler, GM, and Ford for aiding and abetting extrajudicial killing and apartheid.

All other claims are dismissed with prejudice, as any amendment would be futile.[422] The *Khulumani* plaintiffs may file an amended complaint by May 1, 2009. The stay concerning Rheinmetall Group's objections to the exercise of personal jurisdiction and to improper service of process

---

**421.** There are alternative grounds on which KSG lacks standing. *First,* because KSG did not exist at the time of the alleged wrongs at issue, defendants could not have foreseen injuries to the organization. Thus there is an insufficient causal connection between the alleged conduct and the organizational injuries suffered by KSG. *Second,* defendants' conduct was not a proximate cause of KSG's injuries because KSG's formation was an intervening event that severed the causal chain.

**422.** *See, e.g., Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("Although Fed. R.Civ.P. 15(a) provides that leave to amend should be given freely when justice so requires, where, as here, there is no merit in the proposed amendments, leave to amend should be denied.").

under the Hague Convention is now lifted, and Rheinmetall may file a motion to dismiss on those grounds by May 1, 2009.

The Clerk of the Court is directed to close these motions (02 MDL 1499 docket numbers 96, 99, 100, 104, 106, 110, and 115; 02 Civ. 4712 unnumbered; 02 Civ. 6218 unnumbered; 03 Civ. 1024 unnumbered; and 03 Civ. 4524 unnumbered).

SO ORDERED.

## *OPINION & ORDER*

### I. INTRODUCTION AND BACKGROUND

Two actions brought on behalf of massive classes of South Africans ("plaintiffs") assert that several multinational corporations ("defendants") aided and abetted torts in violation of customary international law. Plaintiffs claim jurisdiction in United States courts under the Alien Tort Claims Act ("ATCA").[1] These lawsuits address the obligations of corporations under the law of nations, the role of American courts in enforcing universal norms of international law, and the legacy of South African apartheid.

On April 8, 2009, this Court granted in part and denied in part defendants' consolidated motion to dismiss these actions in their entirety.[2] Defendants now move for reconsideration of two aspects of that decision. *First*, defendants request that this Court reconsider its determination that knowledge—rather than intent—is the *mens rea* requirement for an aiding and abetting claim under the law of nations. *Second*, defendants request that this Court reconsider its holding that some plaintiffs had advanced sufficient allegations to state claims against defendants under a theory of vicarious liability. Defendants argue that vicarious liability cannot be applied to an ATCA claim or—in the alternative— that the standard for vicarious liability between a parent company and a subsidiary is the same as the standard for piercing the corporate veil. Plaintiffs also claim that plaintiffs' allegations are insufficient to establish a plausible claim under the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*.[3] For the reasons that follow, defendants' motion for reconsideration is denied.

### II. APPLICABLE LAW

#### A. Motion for Reconsideration

■ A motion for reconsideration is governed by Local Rule 6.3 and is appropriate where " 'the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.' "[4] "A motion for reconsideration may also be granted to 'correct a clear error or prevent manifest injustice.' "[5]

■ The purpose of Local Rule 6.3 is to " 'ensure the finality of decisions and to

---

1. 28 U.S.C. § 1350. This provision is alternatively known as the Alien Tort Statute ("ATS").

2. *See In re South African Apartheid Litig.*, 617 F.Supp.2d 228 (S.D.N.Y.2009). For the purpose of this decision, the Court presumes familiarity with the April 8 decision.

3. 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929(2007).

4. *In re BDC 56 LLC*, 330 F.3d 111, 123 (2d Cir.2003) (quotation omitted).

5. *In re Terrorist Attacks on September 11, 2001*, No. 03 MDL 1570, 2006 WL 708149, at *1 (S.D.N.Y. Mar. 20, 2006) (quoting *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.1983)).

prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'"[6] Local Rule 6.3 must be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court."[7] Courts have repeatedly been forced to warn counsel that such motions should not be made reflexively, to reargue "'those issues already considered when a party does not like the way the original motion was resolved.'"[8]

## B. Causes of Action Under ATCA

■ The ATCA "enable[s] federal courts to hear claims in a very limited category defined by the law of nations."[9] Aiding and abetting a violation of international law constitutes an independent cause of action under the ATCA.[10] A court must recognize the elements of an ATCA claim from accepted, specific, international legal materials;[11] in the presence of a substantial conflict in authority, this Court must set the requirement at a level where all major sources of customary international law would "authorize the imposition of such liability."[12] On the other hand, "The law of nations . . . leaves to each nation the task of defining the remedies that are available for international law violations."[13]

## C. Federal Common Law of Agency

"It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents . . . in the scope of their authority."[14] "[A] parent corporation is not liable for acts of its subsidiaries simply because it owns the subsidiary's stock."[15] Under federal common law,

the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary

---

6. *Naiman v. New York Univ. Hosps. Ctr.*, No. 95 Civ. 6469, 2005 WL 926904, at *1 (S.D.N.Y. Apr. 1, 2005) (quoting *Carolco Pictures, Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y.1988)). *Accord Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, 233 F.R.D. 355, 361 (S.D.N.Y.2005) ("[A] movant may not raise on a motion for reconsideration any matter that it did not raise previously to the court on the underlying motion sought to be reconsidered.").

7. *DGM Invs., Inc. v. New York Futures Exch., Inc.*, 288 F.Supp.2d 519, 523 (S.D.N.Y.2003) (quotation omitted). *Accord Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir.1995) (holding that a court will deny the motion when the movant "seeks solely to relitigate an issue already decided").

8. *Joseph v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 96 Civ. 9015, 2006 WL 721862, at *2 (S.D.N.Y. Mar. 22, 2006) (quoting *In re Houbigant, Inc.*, 914 F.Supp. 997, 1001 (S.D.N.Y.1996)).

9. *Sosa v. Alvarez–Machain*, 542 U.S. 692, 712, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

10. *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir.2007). *See also id.* at 268 (Katzmann, J., concurring) (noting that aiding and abetting is an independent violation of the law of nations).

11. *See Sosa*, 542 U.S. at 729 (noting that the judicial act is "recognition," not common-law rulemaking); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 174–75 (2d Cir.2009) (laying out the requirements for recognition of a cause of action under the ATCA).

12. *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring).

13. *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir.1995).

14. *Meyer v. Holley*, 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003).

15. Restatement (Third) of Agency § 1.01 cmt. f(2) (citing *United States v. Bestfoods*, 524 U.S. 51, 62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)).

to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.[16]

In contrast, piercing of the corporate veil requires a multi-factor analysis,[17] and tends to occur when there is "actual domination" of a subsidiary in its entirety.[18]

"[J]ust as one corporation can hire another to act as its agent, a parent can commission its subsidiary to do the same. If such an agency arrangement is alleged, then the plaintiff should not have to also allege domination and intent to defraud for the claim to survive." [19]

## III. DISCUSSION

### A. *Mens Rea Standard*

This Court engaged in an in-depth and painstaking legal analysis to determine the proper *mens rea* standard for an aiding and abetting claim under customary international law. In their motion for reconsid-

eration, defendants have identified neither controlling decisions nor facts that this Court neglected to consider or to follow. On that basis alone, defendants' motion for reconsideration is denied with regard to this Court's determination of the *mens rea* standard. That said—because of the importance of this litigation—I will briefly address defendants' arguments.

In response to the April 8 decision, defendants have shifted the emphasis of their prior motion. This Court has imposed a "lowest-common-denominator approach" to liability under the law of nations, in order to cabin the role of American Courts under the ATCA to law enforcement, rather than law making.[20] Defendants now focus exclusively on the Rome Statute of the International Criminal Court, which this Court recognized presents "the most difficult question concerning the universality of the knowledge standard for aiding and abetting under customary international law." [21] Article 25(c) of the Rome Statute creates criminal liability against an individual who, "[f]or the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission." [22]

16. *Transamerica Leasing, Inc. v. Republica de Venezuela*, 200 F.3d 843, 849 (D.C.Cir.2000) (citing Restatement (Second) of Agency § 1).

17. *See MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir.2001) (quoting *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)) (enumerating ten factors).

18. *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996) (quoting *Williams v. McAllister Bros. Inc.*, 534 F.2d 19, 22 (2d Cir.1976)).

19. *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F.Supp. 407, 413 (S.D.N.Y.1996). *Accord Bowoto v. Chevron*, 312 F.Supp.2d 1229, 1238 (N.D.Cal.2004) ("A parent company can be

held vicariously liable for the acts of a subsidiary corporation if an agency relationship exists between the parent and the subsidiary."); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *13 n. 14 (S.D.N.Y. Feb. 28, 2002). Although *Royal Industries* applied New York law, 926 F.Supp. at 412 n. 6, similar logic is found in federal common law. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 629, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (distinguishing an alter ego claim from a vicarious liability claim).

20. *In re South African Apartheid Litig.*, 617 F.Supp.2d at 259.

21. *Id.* at 260.

As this Court previously noted, "the Rome Statute 'has yet to be construed by the International Criminal Court' and that 'its precise contours and the extent to which it may differ from customary international law thus remain somewhat uncertain.' "[23] In light of both the ambiguity of the term "purpose" in Article 25(c) and the treaty-specific definition of the word "intent" found in Article 30, this Court interpreted the term "purpose" in conformity with the knowledge standard found in pre-Rome Statute customary international law.[24]

Nevertheless, defendants argue that "Article 25(c)'s purpose requirement was 'borrowed from Model Penal Code (MPC),' " and therefore must be interpreted using American criminal law precedents.[25] Even granting this premise for the

sake of argument, such direct borrowing would not change the outcome of this Court's decision. If Article 25(c) was taken directly from the MPC—rather than customary international law—then Article 25(c) is not a statement of customary international law. In effect, defendants would render Article 25(c) *lex specialis*, law particular to the International Criminal Court.[26] The Rome Statute established a unique tribunal under a specified mandate; it did not codify the law of nations.[27] Therefore, the deliberate adoption of principles drawn from outside of customary international law concerns the International Criminal Court alone; it does not reflect a collective decision of the signatories of the Rome Statute to alter well-established principles.[28]

Thus either Article 25(c) is ambiguous and is best interpreted to create a

22. Rome Statute of the International Criminal Court ("Rome Statute") art. 25(c), July 17, 1998, 2187 U.N.T.S. 90 (emphasis added).

23. *In re South African Apartheid Litig.*, 617 F.Supp.2d at 261 (quoting *Khulumani*, 504 F.3d at 275–76 (Katzmann, J., concurring)). *Accord* Kai Ambos, *General Principles of Criminal law in the Rome Statute*, 10 Crim. Law Forum 1, 11 (1999) ("It remains (still!) a task for future jurisprudence or scholarly writing to develop more concrete guidelines regarding the minimum requirements for complicity.").

24. *See In re South African Apartheid Litig.*, 617 F.Supp.2d at 261.

25. Memorandum in Support of Defendants' Motion for Reconsideration ("Def.Mem.") at 3 (quoting Ambos, *supra*, at 10). *Cf. 14 Penn Plaza LLC v. Pyett*, —— U.S. ——, 129 S.Ct. 1456, 1478, 173 L.Ed.2d 398 (2009) ("The 'interpretation of Title VII [of the Civil Rights Act of 1964] ... applies with equal force in the context of age discrimination, for the substantive provisions of the [Age Discrimination in Employment Act] were derived *in haec verba* from Title VII ....' " (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985))).

26. *See In re South African Apartheid Litig.*, 617 F.Supp.2d at 261 & n. 176 (noting the inclusion of lex specialis in the Rome Statute).

27. Notably the United Nations International Law Commission exists for that particular purpose. *See* Statute of the International Law Commission, art. 15, UN Doc. A/CN.4/4/Rev.2 (1982) (establishing a commission to promote "the more precise formulation and systematization of rules of international law in fields where there already has been extensive State practice, precedent and doctrine").

28. *Cf.* Ambros, *supra*, at 7 (noting that some aspects of the Rome Statute were crafted to maintain "the Court's jurisdictional focus"). The recognition that a portion of the Rome Statute constitutes *lex specialis* does not conflict with the general proposition that "[The Rome Statute] may ... be taken 'by and large ... as constituting an authoritative expression of the legal views of a great number of States.' " *Khulumani*, 504 F.3d at 276 (Katzmann, J., concurring) (quoting *Prosecutor v. Furundzija*, Case No. IT–95–17/1, Trial Chamber Judgment ¶ 277).

knowledge standard (as this Court previously held), or it should be interpreted using American legal precedents concerning American criminal law but is irrelevant to the analysis of customary international law. Therefore, this Court did not err in holding that an individual is liable for aiding and abetting under the law of nations if he or she *knows* that his or her acts will provide substantial assistance to a crime in violation of customary international law.

## B. Agency

Although defendants made specific arguments concerning piercing of the corporate veil in their motion to dismiss, they did not directly address plaintiffs' theory of vicarious liability.[29] On that basis alone, defendants have waived any argument that plaintiffs' claims must be dismissed based on the absence of agency liability. Nor have defendants identified controlling decisions that this Court neglected to follow. Therefore defendants' motion for reconsideration is denied with regard to this Court's holdings concerning vicarious liability. Nevertheless, I will again briefly address defendants' arguments.

## 1. Vicarious Liability Under ATCA

Defendants first argue that vicarious liability is unavailable under customary international law, necessitating dismissal of all claims. This Court previously found that vicarious liability is universally accepted as a component of customary international law, specifically pointing to the principle of command responsibility.[30] On the other hand, the Court recognized that the contours of vicarious civil liability have not been defined with specificity,[31] in other words with the "definite content" required for recognition of a cause of action under the Supreme Court's decision in *Sosa v. Alvarez–Machain.*[32] However, this does not require that courts exercising ATCA jurisdiction decline to impose vicarious liability.

■■■ *Sosa* expressly applies its limitations to "accepting a cause of action."[33] Vicarious liability is not a cause of action; it is a principle for the distribution of civil liability for an independent tort. Although both prohibitory norms and liability-distributing rules influence incentives, the former bars conduct while the latter

29. *See* Memorandum of Law in Support of Defendant General Motors Corporation's Motion to Dismiss at 2–3 (citing cases concerning piercing of the corporate veil); Memorandum of Law in Support of Defendants Fujitsu Ltd's and Barclays Bank PLC's Motion to Dismiss at 5 (same). *See also* Memorandum of Law in Support of IBM's Supplemental Motion to Dismiss at 1 (expressly relying on General Motors' "discussion of the relevant legal standard"); Memorandum of Law in Support of Defendant Ford Motor Company's Motion to Dismiss at 2 (same); Defendant Daimler AG's Supplemental Memorandum of Law in Support of Defendants' Joint Motion to Dismiss at 5–6 (same). Although defendants raised arguments specific to vicarious liability in their reply memorandum, *see* Reply Memorandum in Support of Defendants' Motions to Dismiss at 38, arguments made for the first time in a reply brief are not properly

before the Court. *See, e.g., Coosemans Specialties, Inc. v. Gargiulo,* 485 F.3d 701, 708–09 (2d Cir.2007).

30. *See In re South African Apartheid Litig.,* 617 F.Supp.2d at 271 (citing Control Council Law No. 10, art. II, reprinted in Telford Taylor, *Final Report to the Secretary of the Army on the Nuremberg War Crimes Trials Under Control Council Law No. 10,* at 251 (1949)). The Second Circuit has also previously applied agency analysis in an ATCA case. *See Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95–96 (2d Cir.2000).

31. *See In re South African Apartheid Litig.,* 617 F.Supp.2d at 271.

32. 542 U.S. at 732.

33. *Id.*

merely allocates responsibility. Thus a prohibitory norm contains a distinct moral element of universal condemnation,[34] and liability-distributing rules do not, as liability stems not from the use of an agent alone but from the use of an agent to accomplish an unlawful end. Thus this Court does not impermissibly expand its role under ATCA by resorting to federal common law to establish principles of vicarious liability, which are the means of domestic enforcement against those who violate internationally recognized torts.[35] Therefore, this Court will continue to apply vicarious liability to ATCA claims.

### 2. Vicarious Liability Under Federal Common Law

Defendants next argue that heightened standards apply to a vicarious liability claim involving a parent company and a subsidiary.[36] Specifically, defendants contend that when the alleged principal and agent are a corporation and its subsidiary, a court must apply the test for piercing of the corporate veil, rather than the ordinary test for vicarious liability. This argument is unpersuasive. There is no basis to extend special protection against vicarious liability to a parent company that engages its subsidiary as its agent.

Defendants principally rely on the Supreme Court's decision in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* (*"Bancec"*). However, *Bancec* addresses piercing of the corporate veil, rather than allegations of a principal/agent relationship.[37] *Bancec* specifically distinguishes a prior case in which the Court had applied vicarious liability to a corporation and notes that piercing of the corporate veil constitutes a " 'broader equitable principle.' "[38] The Second Circuit cases cited by defendants similarly address the showing necessary to treat independent corporations as alter egos.[39] No decision binding this Court supports conflating the standards for alter ego claims and vicarious liability claims against corporate parents.[40]

■ Piercing of the corporate veil and vicarious liability are conceptually distinct.

---

**34.** *Cf. id.* at 762 (Breyer, J., concurring) (describing international law as recognizing "certain universally condemned behavior").

**35.** Notably, if all aspects of domestic enforcement of the law of nations were required to reflect international rules, ATCA—a unique American statute—would be a nullity. This view has been firmly rejected. *See id.* at 729. (holding that international torts may be enforced via a domestic jurisdictional statute).

**36.** Defendants acknowledge that the standard they argue for is beyond "ordinary agency principles." Def. Mem. at 8.

**37.** *See, e.g.,* 462 U.S. at 623 (framing the dispute around "whether Bancec is an 'alter ego' or a 'mere instrumentality' of the Cuban Government").

**38.** *Id.* at 639 (quoting *Taylor v. Standard Gas Co.*, 306 U.S. 307, 322, 59 S.Ct. 543, 83 L.Ed. 669 (1939)).

**39.** *See De Jesus,* 87 F.3d at 70 (addressing " 'the showing of actual domination required *to pierce the corporate veil.*' " (quoting *Williams,* 534 F.2d at 22)) (emphasis added); *De Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir.1984) (assessing the validity of defendant's "separate status").

**40.** Although some district courts have blurred the distinction between alter ego and agency, this Court is not persuaded by that non-binding authority. *See LNC Invs., Inc. v. Republic of Nicaragua,* 115 F.Supp.2d 358, 363 (S.D.N.Y.2000), *aff'd,* 228 F.3d 423 (2d Cir. 2000) (per curiam); *Kashfi v. Phibro–Salomon, Inc.,* 628 F.Supp. 727, 735 (S.D.N.Y. 1986) (citing *Fidenas A.G. v. Honeywell, Inc.,* 501 F.Supp. 1029, 1037 (S.D.N.Y.1980)). *See also In re Parmalat Secs. Litig.,* 501 F.Supp.2d 560, 588 n. 149 (S.D.N.Y.2007) (noting the conflict between courts that have conflated the standards and those that have not and holding that plaintiffs failed to state a claim under either standard).

When a court determines that two companies are alter egos, they may be treated as one unit for all legal purposes. On the other hand, vicarious liability runs only in one direction—from agent to principal—and relates only to particular actions. The "presumption of separateness" that applies to a corporation and its subsidiary is reasonably applied to the alter ego inquiry.[41] On the other hand, corporations would serve little function if they were not able to hire agents or independent contractors. Given the convergence of interests between a parent company and a subsidiary, as well as the limitation on the direct operation of foreign corporations in many nations, the use of a foreign subsidiary as an agent is a widely-utilized business strategy.[42] Therefore, it is not reasonable to apply a presumption against vicarious liability to a corporation, even when the alleged agent is another corporation in which the purported principal holds stock. This Court will continue to apply the ordinary federal common law test for agency in this litigation.

### 3. Application of the Standard

Even conceding—for the sake of argument—that the Court determined the proper standard for vicarious liability between a parent company and a subsidiary, defendants argue that plaintiffs have not advanced allegations concerning agency with sufficient specificity and plausibility to survive a motion to dismiss. As defendants have not established that this Court neglected to address either binding precedent or pertinent facts, it serves no purpose for this Court to reassess the same allegations against the same standard discussed in the April 8th opinion. The *Ntsebeza* plaintiffs' agency allegations are sufficient to survive a motion to dismiss.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for reconsideration is denied. The Clerk of the Court is ordered to close this motion (02 MDL 1499, No. 143; 02 Civ. 4712, No. 94; 02 Civ. 6218, No. 138; 03 Civ. 1024, No. 19; and 03 Civ. 4524, No. 62).

SO ORDERED.

---

41. *EM Ltd. v. Republic of Argentina,* 473 F.3d 463, 479 (2d Cir.2007).

42. *See* Kojo Yelpaala, *Strategy and Planning in Global Product Distribution—Beyond the Distribution Contract,* 25 Law & Pol'y Int'l Bus. 839, 881–84 (1994). *See also id.* at 871 n. 101 (discussing regulation by numerous nations of the "conditions under which foreign corporations may do business").